**Raymon TATE, Liberty Fuels, Inc., Dale Sobek, and 6000 S Corporation, Plaintiffs,**

v.

**PACIFIC GAS & ELECTRIC CO., Southern California Gas Co., and San Diego Gas & Electric Co., Defendants.**

**No. C 01–04015 WHA.**

United States District Court, N.D. California.

June 17, 2002.

---

Jodi Chall, Terri Mandel, Law Office of Terri Mandel, San Mateo, CA, for Raymon Tate, Liberty Fuels, Inc., Dale Sobek.

Jodi Chall, Law Office of Terri Mandel, San Mateo, CA, for 6000 S Corp.

Paul J. Riehle, Matthew A. Fischer, Michelle L. Younkin, Sedgwick Detert Moran & Arnold, San Francisco, CA, Michael D. Whelan, Stephen L. Schirle, PG&E Law Dept., San Francisco, CA, for Pacific Gas & Electric Company.

David I. Hurwitz, Stan Blumenfeld, O'Melveny & Myers, LLP, Los Angeles, CA, for Southern California Gas, San Diego Gas & Elec.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

ALSUP, District Judge.

### INTRODUCTION

In this antitrust and RICO case, this order eliminates all federal claims save one against defendant Pacific Gas & Electric Company, which may go forward without prejudice to a motion for summary judgment after further opportunity for discovery.

### STATEMENT

On a motion to dismiss the second amended complaint, this order treats, as it must, all well-pled facts as true. Plaintiff Raymon Tate is a skilled mechanic. From 1990 until at least 2000, he developed facilities and technology for conversion of gasoline-powered vehicles to natural-gas-powered vehicles. By July 1994, he had patented a device for converting natural gas into liquefied natural gas (LNG) (¶ 67). Although this device is portable, it is about the size of a locomotive. It is called the Liberty Station 2000. The idea is that the device can be moved to and operated at, for example, a fleet yard and used to refuel converted vehicles.

Skipping over two successive companies Tate founded and either closed or put into bankruptcy, the story really begins with Liberty Fuels, Inc., formed by Tate in December 1997. Liberty Fuels acquired an option on the patents referenced above. The company raised at least one million dollars and grew to ten employees. Liberty Fuels built and operated a demonstration unit in Santa Cruz. By June 1998, Liberty Fuels had built two prototypes of the Liberty Station 2000 that produced LNG. It established a production facility in 1999 to manufacture more units.

The business plan called for selling the liquefaction units to commercial and municipal fleets (¶ 66). According to the complaint, federal and state laws provided (and still provide) incentives, if not requirements, for commercial and municipal fleets to convert to low-emission fuels, such as natural gas. Consequently, since the early 1990's, various commercial and municipal fleets of all types have been steadily converting. They include taxi cabs, school buses, sanitation trucks, municipal buses, commercial truck fleets, utility repair trucks, and so on.

The Liberty Station 2000, of course, required a source of supply for natural gas. The plan was to tie into the local utility feedstock lines, draw gas into the unit, and then process the gas into LNG. Fleet vehicles would then pull alongside the unit and refuel with LNG. A main controversy in the case centers around the alleged refusal of defendant PG & E to facilitate connections to its feedstock lines, about which more will be said below.

As far as natural gas is concerned, there are two alternative technologies. Compressed natural gas (CNG) is compressed but not liquefied. Converted vehicles simply run on the pressurized gas with engines modified to burn natural gas. The other is LNG. Because it is liquefied, LNG has the advantage of packing more BTU's in the same size gas tank. A tank of LNG will carry a vehicle much farther than a similar-sized tank of CNG. The capital cost of a liquefier like the Liberty Station 2000, however, is more than for a compressor for CNG. Although PG & E is developing its own small-scale liquefier for eventual use by fleets, the Liberty Station 2000 was the only small-scale liquefier offered in California at the times relevant in the pleading.

All went well with the demonstration project for the Liberty Station 2000 in Santa Cruz. In July 1998, Liberty Fuels requested a tie-in for the demonstration unit to PG & E's feedstock lines. The demonstration unit needed fifty pounds per square inch of gas pressure as the input. There was no problem in PG & E supplying the necessary pressure. PG & E assisted in all respects. The paperwork involved included a site plan and an application to trench and to connect. The interconnection process went smoothly. Liberty Fuels paid $18,000 to PG & E to obtain the service.

Once Liberty Fuels began trying to market its units to commercial and municipal fleets, however, PG & E allegedly found various excuses to frustrate and to avoid any interconnections. For example, in 1999, Liberty Fuels signed a contract with De Soto Cab in San Francisco, whereby it ordered a Liberty Station 2000 liquefaction unit (¶ 141). When Liberty Fuels asked PG & E to assist in a gas tie-in, PG & E stated, "We know you need 50 lbs. of pressure but we can only give you 20" (¶ 162). Similarly, when Liberty Fuels was pursuing possible customer locations in San Jose, PG & E told it: "We know you need 50 lbs. but we can only give you 20 lbs. of pressure" (¶ 161). Liberty Fuels, however, eventually went to the PG & E mapping department and learned that the pipelines actually produced over sixty pounds per square inch. In essence, the second amended complaint alleges that PG & E lied about the amount of pressure available, thereby making the prospective sites unfeasible or substantially and unnecessarily raising the cost of plaintiffs to sell their product. Access to fifty pounds per square inch was essential to the commercial success of the Liberty Station 2000 program.

PG & E, it is alleged, sought to impede the success of the Liberty Station 2000 in order to monopolize the market for technology for refueling natural-gas vehicles in

its service area. As stated, there are two types of low-emissions fuel systems: CNG which requires a lower capital investment and LNG, which requires more. PG & E itself has adopted CNG for its own fleets. PG & E sells its "excess" CNG to other commercial and industrial fleets at a profit. In order to protect its profit on such excess sales and to subsidize and support its CNG system, PG & E had a motive to discourage commercial and municipal fleets from selecting LNG systems, such as plaintiffs' LNG system. PG & E also has alleged plans to sell LNG and to market its own small-scale liquefaction units. By suppressing plaintiffs, PG & E has, allegedly, preserved sales for itself. Had it taken hold, plaintiffs' technology would have made it harder for PG & E to capture the market.

PG & E competed head-to-head with plaintiffs to make installations at De Soto Cab Company and other fleets in the Bay Area. In addition to feet-dragging on tie-ins, PG & E disparaged plaintiffs and their technology in beauty contests with potential customers. And, PG & E gained an alleged unfair competitive advantage over plaintiffs by receiving public funds to develop its products. The net result was that Liberty Fuels ceased all operations in 2000 due to its inability to make any sales and is now in bankruptcy. This suit followed in 2001. After multiple hearings and multiple amended pleadings, the validity of the second amended complaint is ripe for decision under Rule 12.

By way of procedural history, this action was commenced on October 25, 2001. On November 30, 2001, plaintiffs filed the first amended complaint. The same causes of action were re-asserted. After hearing, plaintiffs' motion for provisional relief was denied by order filed on January 11, 2002. On February 11, defendants moved to dismiss the first amended complaint. Since the first amended complaint was too disorganized and internally inconsistent, the Court withheld immediately ruling on the merits of the motions to dismiss. It gave plaintiffs a choice of standing on their pleading or taking one more opportunity to plead their best case on federal antitrust and RICO claims, taking into account the arguments made to dismiss. Plaintiffs chose to amend the federal claims. The state-law claims were held in abeyance. On April 18, 2002, plaintiffs filed the second amended complaint. Now, defendants collectively move to dismiss the federal claims in the second amended complaint.[1]

## ANALYSIS

### I. SECTION 2 MONOPOLIZATION CLAIM AGAINST PG & E.

#### A. The Relevant Market.

■ The second amended complaint adequately alleges that there was and remains an expanding demand among fleet owners for natural-gas vehicles, their specialized fuels and the associated equipment. A converting fleet must choose between LNG and CNG technologies. At this decisive junction, both LNG and CNG technologies plainly compete. Thus, at all material times, PG & E (selling CNG) and plaintiffs (selling LNG) competed with one another in the business of supplying natural-gas technologies and/or the specialized equipment needed to supply the specialized fuels.

It is true that plaintiffs concede that LNG and CNG are "not fungible" (¶ 97). Contrary to defendants' argu-

---

1. On May 8, 2002, the parties stipulated to the dismissal of all defendants without prejudice, except for utilities defendants Pacific Gas & Electric Company, Southern California Gas and San Diego Gas & Electric. Only these three defendants remain in this action. Only these three are listed in the caption of this order.

ments, however, this difference in the two technologies does not negate the competition between the two alternatives at the all-important fleet-conversion juncture. And, while at the same juncture, electric or diesel vehicles might be contenders, the second amended complaint makes a plausible case that natural gas is the preferred and practical choice among those fleets in considering low-emission alternatives, a market that has been heavily subsidized and promoted by California law (¶¶ 46–62, 82, 98, 119–121, 137(b), 140, 164). Consequently, this order holds that the pleading adequately alleges a product market consisting of the technology and know-how necessary for the ongoing refueling of LNG or CNG for natural-gas fleets.

Turning to the geographic component, the principal means of transport in America of natural gas are the various regional utility districts with their underground grids of feedstock lines. Within its service region, no one can access the PG & E grid without PG & E's approval and cooperation. Within its service region, of course, PG & E has the only grid. The various utilities in different service regions do not compete with each other, *e.g.*, San Diego Gas & Electric Company does not compete with PG & E in the supply of natural gas. This territorial division, established by law, Cal. Pub. Util.Code § 17379 (1994), casts, in turn, a shadow across the downstream market, *i.e.*, the product market. Put differently, just as the natural-gas utilities do not compete with each other in transporting natural gas, they do not compete with each other in the downstream market for refueling technology.

That said, the relevant geographic market must include those suppliers to whom a customer could turn in the face of a significant and non-transitory price in-

crease. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991). As for CNG, PG & E sells one hundred percent of the natural gas that is compressed for use in vehicles within its service territory and sells over half of the CNG itself (¶¶ 89, 133).[2] CNG being in gas form, albeit compressed, is insufficiently compact to justify the transportation cost from elsewhere into the district. .

As for LNG, the situation is different. While a fleet owner in the PG & E territory could *not* turn to San Diego Gas & Electric Company, the fleet owner could turn to a non-utility LNG supplier. Although there are no such suppliers in California, Applied LNG Technologies, located in Arizona, is such a supplier of LNG. It operates a large-scale liquefaction facility in Arizona (¶¶ 87, 192, 210) and then trucks the LNG to various locations in California and elsewhere in the United States. Applied LNG plans, according to the second amended complaint, to build another liquefier plant in Kern County in California (¶ 192). There is a large and growing demand for LNG and the large liquefiers are already operating at maximum capacity (¶ 197).

The infrastructure needed to serve LNG fleets has also not yet developed. A fleet vehicle cannot simply pull off the highway at convenient locations and fill up, as with gasoline-powered vehicles. LNG stations are few and far between. The only mobile LNG refueling company in California is operated by Applied LNG Technologies (¶ 191). Fleet operators must have their own infrastructures for refueling, namely tanks and equipment capable of holding LNG at the fleet yard. Trucking LNG from Arizona entails leakage (as the liquefied fuel evaporates unless kept very cold)

---

**2.** Paragraph 89 alleges PG & E provides one hundred percent of the CNG in its region, but plaintiffs' counsel modified this to "over fifty percent" at the hearing on June 13.

and high transportation costs (¶¶ 96, 191–192). Although the pleading does not say so, one may infer that leakage will also occur at holding tanks used to receive and store LNG at fleet yards in between tanker-truck deliveries. The cost to build a large-scale liquefaction factory would be large—at least $25 million (¶ 87). None yet exists in California.

In time, it appears that the LNG infrastructure may improve. Given the advantage of LNG over CNG and the current limited supply of LNG, PG & E itself has stated in public reports that it is planning to build a small liquefier plant in northern California at a cost of three to four million dollars (¶ 192). PG & E also plans to build refueling stations in northern California (¶ 197). This is because, in PG & E's words, "[t]he market for LNG is so large and all of the large liquefiers are at their maximum capacity" (¶ 197).

The Liberty Station 2000 was aimed at providing less expensive means for a steady supply of LNG and thereby avoiding the higher cost of trucked-in LNG. A fair reading of the pleading is that, due to the distances and costs involved, trucked-in LNG is not, at present, a cost-effective alternative for fleets in PG & E's service area.

*    *    *    *    *    *

In light of the primitive nature of the LNG infrastructure and the high cost of trucking LNG from Arizona, the second amended complaint adequately demonstrates that PG & E could succeed in raising its CNG prices within its service region to a significant degree before converting fleet owners would turn to the alternative of trucking in LNG from Arizona. Consequently, indulging in the inferences that must be made on a Rule 12 motion, the pleading adequately alleges a market for the sale of technology (including equipment and know-how) and fuel for the ongoing refueling of natural-gas powered fleets in PG & E's service area.

## B. Monopoly Power.

■ PG & E's argument that the pleading fails to allege that it has market power (Br.6–8) does not come to grips with the main thrust of the pleading. Its main thrust is that fleets have been in the process of converting to alternative fuel technology and, in doing so, fleet operators have been choosing between LNG and CNG technology. It has been at this critical juncture that the two technologies have competed.

Thus, contrary to PG & E's argument, it does not matter that PG & E is not yet in the LNG business. That is actually plaintiffs' point—PG & E wanted to eliminate the LNG threat posed by the Liberty Station 2000 so as to protect its CNG operations and to clear the way for PG & E's own LNG liquefier now in the testing phase.

Nor does it matter that once a fleet is locked in to either CNG or LNG they are not fungible. While that fact is conceded in the pleading (¶ 97), it misses the main point, which is that CNG and LNG compete *at the point of conversion*. By way of a familiar example, everyone would agree that compact disks and tapes compete—but once a consumer buys a new system, the two technologies are not fungible for that consumer.

Nor does it matter that, since deregulation, 166 other firms across America sell blocks of natural gas (¶ 89). Regardless of who sells the blocks of gas, PG & E is the *only* firm authorized to physically deliver the gas via the utility lines within the PG & E service areas (*ibid.*). This case is not about monopoly pricing in the sale of gas but about—allegedly—PG & E frustrating the ability of downstream competitors in

PG & E's captive region physically to access the gas.

Within its service area, PG & E delivers one hundred percent of the natural gas that is compressed for CNG (¶¶ 89, 133) and sells over fifty percent of the CNG itself (see note 2, *supra* ). As for LNG in the same territory, it appears that very few LNG conversions have actually been yet made, although LNG looms large on the horizon. Plaintiffs tried to sell LNG technology in this market. They failed. The pleading is ambiguous as to where Applied LNG's outlets are in California, *i.e.,* specifically whether any are in PG & E's service territory. The pleading, however, is clear that any such outlets are sparse (¶¶ 191–92). As a result, the pleading adequately alleges that PG & E controls at least half of the relevant market within its service territory and thus has market power. *Rebel Oil Co., Inc., v. Atlantic Richfield Co.,* 51 F.3d 1421, 1438 (9th Cir.1995).

### C.  Alleged Predatory Acts and the Alleged Denial of Essential Facilities.

The nub of the case comes down to whether PG & E has perpetrated predatory acts to maintain its monopoly power in the relevant market. *See United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). With one possible exception, the pleading fails to set forth cognizable predatory acts, as is now explained.

### 1.  False Grant Applications.

■ Contrary to plaintiffs' argument, filing false grant applications with government agencies to obtain LNG demonstration projects cannot constitute predation. Such lobbying is immune under the *Noerr–Pennington* doctrine—even if it is anticompetitive in intent. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

### 2.  Product Disparagement.

■ Plaintiffs allege that PG & E violated Section 2 of the Sherman Act under a product-disparagement theory by making negative comments to customers with whom plaintiffs were in active negotiation (¶¶ 139, 134, 137, 144, 146), by failing to mention the existence of LNG on its website or in informational booklets (¶¶ 97, 127, 137), and by providing false information about plaintiffs to the government (¶ 128).

Under *Kottle v. Northwest Kidney Centers,* 146 F.3d 1056, 1059 (9th Cir.1998), the defendant's lobbying of the government is immune under *Noerr–Pennington* from federal antitrust charges. These charges cannot qualify as predatory acts.

Nor can the remaining disparagement qualify. Under *American Prof'l Testing Serv., Inc., v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.,* 108 F.3d 1147 (9th Cir.1997), disparaging comments made by a rival company rarely rise to the level of a Section 2 violation. *Id.* at 1151. Imposing an elevated standard, the Ninth Circuit requires that the plaintiff make a preliminary showing that the alleged violations have a "significantly more-than-temporary harmful effect[ ] on competition," not merely a harmful effect on itself. 108 F.3d at 1151. When making this preliminary showing, the plaintiff must overcome a presumption that the violations had a *de minimis* effect on competition. *Id.* at 1152.

The Ninth Circuit has adopted the test in *Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.,* 850 F.2d 904 (2nd Cir.1988), for

overcoming the *de minimus* presumption in a product-disparagement case. The plaintiff must show "by cumulative proof that the representations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offsets by rivals." *American Prof'l Testing Serv.*, 108 F.3d at 1151, *citing Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).

For purposes of the Rule 12(b)(6) motion, all of plaintiffs' well-pled allegations must be taken as true. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996). Nevertheless, plaintiffs have not alleged sufficient facts to establish a legally cognizable claim under the six-factor test. Plaintiffs have not pled that the defendant's disparaging comments were clearly *likely to induce reasonable reliance* by the public or private clients, or that disparaging comments were made to buyers *without knowledge of the subject matter*, or that the violations were *not readily susceptible to neutralization* or other offsets by rivals.

The type of customers at issue was sufficiently sophisticated so as not to be fooled easily by PG & E's misinformation. Plaintiffs were capable of defending their product and winning over customers based on the merits. In the marketplace of ideas, there is competition and competing information. It is all too easy for losers in the rough-and-tumble of commerce to accuse competitors of spreading false information. The alleged acts are not predatory under the six-factor test set forth above.

■ Plaintiffs' final product-disparagement theory relates to *favorable* information that the defendant did *not* disseminate about the plaintiffs' product or LNG in general. Plaintiffs contend that PG & E's educational material omitted information about plaintiffs and LNG in furtherance of its monopolist goals (¶ 125). These alleged omissions clearly fail. Plaintiffs do not allege that Liberty Fuel was unable to advertise on its own as a result of this activity, or that PG & E provided false or disparaging information in its educational material. In America, one competitor does not have to slit its own throat by promoting the wares of another.

### 3. Alleged Predatory Pricing.

■ The second amended complaint clearly fails to allege predatory (below-cost) pricing. The closest it comes is the allegation that PG & E has falsely represented that it *could* sell LNG to end-users for thirty cents per gallon (¶¶ 203, 206, 223(d)). Whether this comment was true or not, whether thirty cents would have been below cost or not, the fact is plain that no sales of LNG have ever been made at that price (or any other price) by PG & E. No predatory pricing has been properly alleged.

### 4. Alleged Refusal to Supply Natural Gas.

■ The closest issue presented is whether PG & E's responses to plaintiffs' oral inquiries concerning gas-pressure availability at various potential customer sites constituted predation. As stated, the Liberty Station 2000 needed an input pressure of fifty pounds per square inch. PG & E supplied this amount of pressure for the demonstration unit in Santa Cruz (¶ 160). This was after plaintiffs submitted a written site plan and application to trench and to connect, and paid $18,000. When, however, plaintiffs were on the verge of sales to fleets, PG & E told plaintiffs, upon inquiry, that PG & E could only deliver twenty pounds of pressure at numerous potential customer locations

(¶¶ 161–162). The complaint alleges that this was false and that PG & E's own maps, at least in some areas, indicated sixty pounds of pressure was available (¶ 161).

Given that PG & E dominated both the relevant downstream market and upstream utility market, it would have been predatory for PG & E to frustrate interconnections or to impose substantial conditions not imposed on others, where the intent or effect was to suppress competition in the downstream market, at least where such an installation would have been permissible under the relevant utility law, the interconnection was properly requested, and no valid business justification existed for a refusal. *Aspen Skiing Co. v. Skiing Corp.*, 472 U.S. 585, 595–96, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Oahu Gas Serv., Inc., v. Pacific Resources, Inc.*, 838 F.2d 360, 367–68 (9th Cir.1988). This statement of the law follows from two separate lines of cases.

It is correct that the Ninth Circuit has rejected the Second Circuit's view that "a firm violates § 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market." *Alaska Airlines, Inc., v. United Air Lines, Inc.*, 948 F.2d 536, 546 (9th Cir.1991), quoting and rejecting *Berkey Photo, Inc., v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). It is not enough, the Ninth Circuit held, merely to obtain a competitive advantage in the second market. Rather, the firm must at least attempt to monopolize the second market (948 F.2d at 547):

> We now reject *Berkey's* monopoly leveraging doctrine as an independent theory of liability under Section 2. Even in the two-market situation, a plaintiff cannot establish a violation of Section 2 without proving that the defendant used its mo-

nopoly power in one market to obtain, or attempt to attain, a monopoly in the downstream, or leveraged market. We believe that *Berkey Photo* misapplied the elements of Section 2 merely by obtaining a competitive advantage in the second market, even in the absence of an attempt to monopolize the leveraged market.

Plainly, however, plaintiffs here allege that PG & E *has* attempted to monopolize the downstream market. It has attempted to use its monopoly over the distribution of natural gas in its service area to suffocate nascent competitive technology in the downstream market within its service territory. This theory is viable under Ninth Circuit law. Plaintiffs do not rest on a mere allegation of seeking a competitive advantage in an otherwise competitive downstream market.

The same legal conclusion also follows from the essential-facilities doctrine. Although that rule originated under Section 1 and concerted refusals to deal, the Supreme Court has extended the rule to the case of a single monopolist that denies an essential facility to a downstream competitor. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The Ninth Circuit has distilled the law as follows (948 F.2d at 546):

> ... When a firm's power to exclude rivals from a facility gives the firm the power to *eliminate* competition in a market downstream from the facility, and the firm excludes at least some of its competitors, the danger that the firm will monopolize the downstream market is clear. In this circumstance, a finding of monopolization, or at least attempted monopolization, is appropriate, and there is little need to engage in the usual lengthy analysis of factors such as intent. *Cf. Catlin*, 791 F.2d at 1348 (speci-

fying the elements of a claim for attempted monopolization). We hold that neither defendant denied plaintiffs an "essential" facility in violation of the antitrust laws.

Thus, if PG & E, which held an exclusive franchise on the transportation of natural gas within its service area, denied access to fifty pounds of pressure without a valid business justification (such as public safety) to rivals like plaintiffs in the downstream market, and such denials excluded competition in the downstream market, then a claim under the essential-facility doctrine would lie. It would not matter that some competition in the downstream market remained, so long as "at least some of its competitors" were excluded. *Ibid.* In other words, elimination of competition does not require *total* elimination but it does require sufficient elimination so as to substantially raise the price to the end-user in the downstream market. *Brooke Group, Ltd., v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); *Rebel Oil Co., Inc., v. Atlantic Richfield Co.,* 51 F.3d at 1433.

Turning to the pleading at hand, do the actual allegations pass muster? PG & E argues that they do not. Respecting numerous potential customer sites, the pleading alleges that PG & E, after foot dragging, told plaintiffs it could only deliver twenty pounds at the locations pinpointed by plaintiffs and that this was false (¶ 143, 161–62). While no written application for an interconnection was made, this was because PG & E falsely told Liberty Fuels that only twenty pounds was available at those locations. Proceeding at the locations would have required an additional layer of expense to upgrade the pressure available. This imposed an extra burden on plaintiffs that ordinary customers would not have to bear. By falsely telling plaintiffs that the necessary pressure could not be supplied, PG & E was denying access to an essential facility on the same terms as it made available to the public at large. It did so to eliminate plaintiffs as competitors in the downstream market and did so, it must now be assumed, without any valid business justification. Predation is adequately pled.[3]

Going outside the pleading, PG & E insists that had plaintiffs submitted the proper paperwork, the required fifty pounds of pressure would have been supplied. This argument is based on a PG & E tariff filed with the California Public Utilities Commission, of which judicial notice is requested. The tariff, however, is simply not clear enough in its implications and in its procedure to negate the allegations of the second amended complaint as a matter of law. To an extent the tariff even supports *plaintiffs*, recognizing as it does that high pressure can be delivered without difficulty if the nearby mains already carry the high pressure (Rule 2(K)(4)(c)). PG & E's argument presents ambiguous facts outside the complaint and cannot override the well-pled allegations at the Rule 12 stage.

Nonetheless, in light of PG & E's factual argument that a more complete record would end the only surviving predation claim, this order directs the parties to give reasonable priority in the remaining discovery to the access issue so as to bring a summary-judgment motion on for hearing on **September 19, 2002,** on that sole issue, filing said motion 35 days before that date.

---

**3.** It is true, as PG & E asserts, that *some* of the allegations are phrased in terms of what plaintiffs "understood" rather than what was actually communicated by PG & E. On the other hand, the pleading equally quotes PG & E representatives as stating: "We know you need 50 lbs. but we can only give you 20 lbs. of pressure" (¶ 161). The key allegations are not cast in terms of "understandings."

This is without prejudice to filing a timely summary-judgment motion directed at other issues later. The Court notes that the end of fact discovery is **August 16, 2002,** and will remain so.

## II. THE SECTION 1 CLAIM AGAINST PG & E.

The Section 1 claim depends, according to the second amended complaint, on the alleged refusal to cooperate in interconnecting the plaintiffs' liquefaction unit with the PG & E system (¶¶ 93, 160–61). Since this overlaps with the discovery to be completed, the Rule 12 motion is denied as to this claim without prejudice to the summary-judgment motion to be heard on September 19.

## III. ANTITRUST CLAIMS AGAINST OTHER DEFENDANTS.

The antitrust claims against the other utilities must be dismissed because plaintiffs fail to allege any dealings between plaintiffs and those utilities. For example, there never was any refusal to deal in any shape or form whatsoever by Southern California Gas & Electric Company and/or San Diego Gas & Electric Company.

■ The fact, even if true, that each utility has independently monopolized its own regional market (and downstream market) in no way makes them jointly and severally liable just because each is a utility and/or each participates in some joint endeavors together. A joint venture by two utilities to develop small-scale liquefaction is not predatory and does not, by itself, exclude competition. So too as to conspiracy. The allegations of defendants' conduct are fully consistent with legitimate, nonpredatory action. Bald conspiracy allegations will not suffice. *Harkins Amusement Enters. v. General Cinema Corp.,* 850 F.2d 477, 483 (9th Cir.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989).

## IV. THE RICO CLAIMS.

Plaintiffs allege that defendants engaged in a "pattern of racketeering activity" in violation of 18 U.S.C.1962. Specifically, these civil RICO claims arise from defendants' alleged conduct or participation in the conduct of an "enterprise" known as the California Natural Gas Vehicle Coalition (Coalition) (¶¶ 175, 254). Plaintiffs allege that defendants used the Coalition, in part, "for the purpose of gaining proprietary information from, and control over, competitors in order to shut down the CNG conversion business, to prevent development of the LNG conversion business, to maintain and preserve their monopoly over the manufacture, sale and distribution of CNG and LNG and to disparage and suppress competition" (*ibid.*).

■ An essential element plaintiffs must allege in all their RICO claims is a "pattern of racketeering activity." 18 U.S.C.1962(a)-(d). As the predicate acts of racketeering, the second amended complaint alleges (¶ 257):(1) mail fraud in violation of 18 U.S.C. 1341, (2) wire fraud in violation of 18 U.S.C. 1343, and (3) antitrust violations. In briefing, plaintiffs disclaimed their reliance on antitrust violations for racketeering activity. Plaintiffs state they (Opp.21):

> have not pleaded [sic] antitrust violations as the predicate act in their RICO allegations. Plaintiffs pled as predicate acts numerous, specific factual allegations of concerted fraudulent conduct on the part of the Defendants through the use of the mail, telephone, and the World Wide Web.

This is contradicted by Paragraph 257 of the second amended complaint. At all events, "racketeering activity" as defined under RICO does not include antitrust violations. 18 U.S.C.1961(1); *Jennings v. Emry,* 910 F.2d 1434, 1438 (7th Cir.1990).

██ A fatal flaw in plaintiffs' pleading of racketeering activity (and the RICO claims as a result) concerns mail and wire fraud. These types of predicate acts must be plead with particularity. As the Ninth Circuit stated:

> Federal Rule of Civil Procedure 9(b) requires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme. Fed.R.Civ.P. 9(b). The Ninth Circuit has repeatedly insisted that this rule be followed in RICO actions alleging the predicate act of mail fraud.

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991) (citations omitted). In addition, the pleading must identify "the parties to the misrepresentation." *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1400–1 (9th Cir.1986) (applying Rule 9(b) to wire fraud in RICO claim). The second amended complaint has not pled the predicate acts of mail and wire fraud with particularity. This forecloses all of plaintiffs' RICO claims.[4]

Specifically under the RICO cause of action, plaintiffs allege (¶¶ 260–61):

> 260. Defendants committed mail fraud in violation of 18 U.S.C. § 1961 by sending, amongst others, the following materials, on CNGVC [Coalition] stationery, through the United States Postal Service and/or private mailing companies:
>
> 3. Information sent to the National Natural Gas Vehicle Coalition;
>
> 4. Information sent to the DOE [federal Department of Energy] in requests for funding;
>
> 5. Information sent to the Idaho National Laboratories;
>
> 6. Information sent to the Society of Automotive Engineers;
>
> 7. Information sent to the general membership of the CNGVC [Coalition] and other interested parties; and
>
> 8. Information sent to Members of Congress.
>
> 261. Defendants committed wire fraud in violation of 18 U.S.C. § 1961 by sending e-mails under the auspices of the CNGVC [Coalition] to set up meetings for interested parties, such as equipment manufacturers, and posting false information on the World Wide Web in order to compete in the NG for LEV's industry even though they were precluded by the PUC and the courts from doing the same under their own identities.

These allegations fall short of the required particularity under Rule 9(b). *See Schreiber, supra*, 806 F.2d at 1401. Absent are allegations as to the time-place-manner-content details on the alleged instances of mail and wire fraud. Plaintiffs fail to identify which defendant allegedly committed what specific predicate act under the guise of the Coalition in furtherance of the alleged "enterprise." Nor do plaintiffs identify what role each defendant performed in the alleged fraudulent scheme with the mail and/or wire.

Contrary to the plaintiffs' contention (Br.21), Paragraphs 175 through 190 do not allege "numerous, specific factual allegations of concerted fraudulent conduct *on the part of the Defendants* through the use of mail, telephone, and the World Wide Web." The relevant paragraphs that aver specific instances of mail and wire use concern distributive acts and/or communique authored by Coalition personnel, *not any employee or agent of any defendant*

---

4. Plaintiffs' failure to adequately plead a substantive RICO violation precludes a claim for conspiracy under Section 1962(d). *Howard v.*

*America Online, Inc.*, 208 F.3d 741, 751 (9th Cir.2000).

(¶¶ 183–89). In short, all specific allegations concerning the RICO predicate acts of mail and wire fraud are directed at nonparties. The few allegations on racketeering activity apportioned to defendants fail to identify with any specificity the who-what-when-where-how details of the alleged mail and wire fraud. No specific use of the mail or wire is attributed to any defendant. Plaintiffs' failure to mind this distinction is fatal.[5] *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 541–42 (9th Cir.1989).

Lastly, plaintiffs' reliance on the historical events memorialized within these identified communiques authored and distributed via mail or wire by non-parties is unhelpful. Specifically, plaintiffs contend (Br.22) that they pled "specific incidences of concerted activity" to satisfy alleging mail and wire fraud under Rule 9(b). Thereafter, plaintiffs cite paragraph after paragraph that allege specific historical events memorialized and recounted in these communiques. Some recite historical events involving a defendant. For example (¶ 189):

> 189. On August 27, 1999 Greg Vlasek [the Coalition's executive director] distributed an e-mail to CNGVC [Coalition] members discussing his August activities. He stated he had briefed the CASTO Executive board on CNG school bus strategy development and was helping PG & E with its LNG "demonstration project." He also indicated that he agreed to moderate a CASTO Manager's Forum Panel regarding CNG school buses. He began compiling an information binder to be distributed to 150 school bus fleet managers to the event.

Essentially, plaintiffs are bootstrapping the historical events stated within these communiques into actual acts of mail and wire fraud by defendants. In other words, merely because a defendant is mentioned in a document transmitted through the mail or wire does not equal an alleged violation of federal mail and wire fraud statutes. Even crediting the historical events involving specific defendants within these communiques, none mentions any use of the mails or wires by any defendant.

## CONCLUSION

Federal jurisdiction for this case now hangs by the thread of the alleged obstacles imposed specially on plaintiffs in gaining access to the PG & E pipelines. This question should be given priority and addressed via a motion for summary judgment. If this fact issue (or any other monopolization fact issue) is ultimately resolved on summary judgment for PG & E, then the state claims will be dismissed without prejudice to refiling in state court. If not, then the Section 2 claim and all state claims will go forward against PG & E. All federal claims against San Diego Gas & Electric Co. and Southern California Gas Co. are **DISMISSED.** The state law claims against them are **DISMISSED WITHOUT PREJUDICE** to refiling in state court. The only defendant now left in this case is PG & E. Leave to amend is **DENIED** because several attempts to amend have already been made and the last order made clear that the second amended complaint should plead plaintiffs' best case.

**IT IS SO ORDERED.**

---

5. In addition, plaintiffs' reliance on the statutory elements for mail and wire fraud is misplaced. Merely pleading the statutory elements (which this order expresses no opinion on) does not automatically translate into pleading fraud with specificity. *Cf. Schreiber. supra,* 806 F.2d at 1399–1401.