**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NAME.SPACE, INC.,
*Plaintiff-Appellant*,

v.

INTERNET CORPORATION FOR
ASSIGNED NAMES AND NUMBERS,
*Defendant-Appellee*.

No. 13-55553

D.C. No.
2:12-cv-08676-
PA-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
March 6, 2015—Pasadena, California

Filed July 31, 2015

Before: Stephen Reinhardt, N. Randy Smith,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

# SUMMARY[*]

## Antitrust / Trademark

The panel affirmed the dismissal of an antitrust suit brought against the Internet Corporation for Assigned Names and Numbers, which, under contract with the Department of Commerce, creates and assigns top level domains, such as ".com" and ".net."

name.space, a registry specializing in "expressive" top level domains, such as .art and .food, challenged ICANN's 2012 round of applications for new top level domains to be included in the ICANN "root zone file."

The panel held that the complaint did not state a claim for conspiracy in restraint of trade or commerce under § 1 of the Sherman Act because it did not sufficiently allege an anticompetitive agreement. The complaint did not state a claim for monopolization in violation of § 2 of the Sherman Act because ICANN is not a competitor in the market to act as a top level domain registry, the international market for domain names, or the market for blocking or defensive registration services.

The panel held that trademark and unfair competition claims were not ripe for adjudication because the complaint

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

did not allege that ICANN has delegated or intends to delegate any of the top level domains that name.space uses.

The panel also held that the complaint did not state a claim for tortious interference or unfair business practices.

## COUNSEL

Michael B. Miller (argued), Craig B. Whitney, Adam J. Hunt, Morrison & Foerster LLP, New York, New York, for Plaintiff-Appellant.

Jeffrey A. LeVee (argued), Eric P. Enson, Kathleen P. Wallace, Jones Day, Los Angeles, California, for Defendant-Appellee.

**OPINION**

HURWITZ, Circuit Judge:

The Internet Corporation for Assigned Names and Numbers ("ICANN") creates and assigns top level domains ("TLDs"), such as ".com" and ".net." In 2012, ICANN accepted applications for the creation of new TLDs. This suit alleges that the 2012 Application Round violated federal and California law. The district court dismissed the complaint, and we affirm.

## I.  Factual Background

### A.  Top Level Domains

Each Internet website is assigned a unique Internet Protocol ("IP") numerical address. For ease of searching, websites also have alphanumeric domain names, such as "nytimes.com." The portion before the dot—"nytimes"—is called the "second level domain." The portion after the dot—"com"—is the TLD.

There are three main types of TLDs—sponsored TLDs (such as ".gov" and ".edu"), restricted to users who meet specified criteria; country-code TLDs (such as ".uk" or ".fr"), controlled by sovereign nations; and generic TLDs (such as ".com" and ".net"), those at issue in this case, open to all users. Individual generic TLDs are operated by registries, such as VeriSign, which sell the ability to register a domain name with a particular TLD and maintain a zone file, or registry, of all the domain names associated with that TLD. These registries approve registrars, such as godaddy.com, to sell domain names incorporating those TLDs to the public.

A "Domain Name System" ("DNS") links each of these unique domain names with the IP address corresponding to that website. When an Internet user searches for a domain name, the DNS converts the domain name to the IP address by searching a list of TLDs called the "root zone file" (the "Root"). Additional TLDs are made available by organizations other than ICANN on alternative root files. However, alternative root files can only be accessed through special settings not routinely employed by most Internet users. Thus, the vast majority of Internet users can only access websites with TLDs included in the ICANN-controlled Root. When the complaint in this case was filed, ICANN included eight generic TLDs on the Root.

## B.  ICANN

The DNS and the Root were initially managed by the National Science Foundation. *See* Daniela Michele Spencer, Note, *Much Ado About Nothing: ICANN's New gTLDs*, 29 Berkeley Tech. L.J. 865, 867–69 (2014). In 1997, the National Science Foundation transferred control to the Department of Commerce ("DOC"). The DOC later issued a white paper proposing that management be transferred to a private, not-for-profit corporation. *See* Management of Internet Names and Addresses, 63 Fed. Reg. 31,741, 31,741 (Jun. 10, 1998).[1] The white paper suggested that the corporation's board of directors "should be balanced to equitably represent the interests of IP

---

[1] The white paper was cited repeatedly in the complaint and was therefore incorporated by reference. *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).

number registries, domain name registries, domain name registrars, the technical community, Internet service providers (ISPs), and Internet users (commercial, not-for-profit, and individuals) from around the world." *Id.* at 31,750; *see also* A. Michael Froomkin & Mark A. Lemley, *ICANN and Antitrust*, 2003 U. Ill. L. Rev. 1, 12 (2003).

In 1998, the DOC contracted with ICANN, a non-profit corporation, to manage the Internet Assigned Numbers Authority ("IANA"). *See* Justin T. Lepp, Note, *ICANN's Escape from Antitrust Liability*, 89 Wash. U. L. Rev. 931, 935, 959–60 (2012); Froomkin & Lemley, *supra*, at 15. ICANN thereby obtained the authority to operate the DNS and the Root, add new TLDs to the Root, and determine which registries would operate existing TLDs. The Memorandum of Understanding between the DOC and ICANN reserved the DOC's right to withdraw recognition of ICANN. *See* Froomkin & Lemley, *supra*, at 13–14. In 2009, the Memorandum lapsed and the DOC formally relinquished control over DNS policy to ICANN. *See* Lepp, *supra*, at 935.[2]

ICANN is controlled by a board of directors with qualifications along the lines proposed in the white paper;

---

[2] The DOC, however, still retained the ability to move the IANA contract to another organization. *See* Lepp, *supra*, at 959–60. The federal government plans to end its coordination role when the current IANA contract expires in September 2015, and has asked ICANN to develop a transition plan. *See* Nat'l Telecomms. & Info. Admin., *NTIA Announces Intent to Transition Key Internet Domain Name Functions* (Mar. 14, 2014), http://www.ntia.doc.gov/press-release/2014/ntia-announces-intent-transition-key-internet-domain-name-functions.

many are industry insiders.  The government has no formal input into the selection of the directors.  *See* Froomkin & Lemley, *supra*, at 10–11.

## C.  name.space

name.space is a registry specializing in "expressive" TLDs, such as .art, .food, .magic, .music, .now, and .sucks. According to the complaint, name.space's business model contemplates "the simultaneous operation of a significant number of TLDs."  None of name.space's TLDs is currently available on the Root.

## D.  The 2000 and 2012 Application Rounds

In 2000, ICANN first solicited applications for new TLDs.  The application instructions were seven pages, the fee was $50,000, and a single application could seek multiple TLDs.  The application included a release of all liability against ICANN.  name.space applied for 118 TLDs.  ICANN approved only seven new TLDs, none of which was awarded to name.space.

In 2012, ICANN again accepted applications for new TLDs.  This time, the application guidebook was 349 pages in length, the fee was $185,000, and each application could seek only one TLD.  Unsuccessful applicants from the 2000 Round received an $86,000 credit on one application, but were required to waive any claims arising from the 2000 Round.  name.space did not apply in 2012 because the financial and procedural costs were too high.  As in 2000, applications for new TLDs in 2012 came largely from industry insiders.

The list of TLDs applied for by others in 2012 included 189 TLDs currently in use by name.space.  As of the filing

of the complaint, ICANN had not announced which new TLDs will be included on the Root.**[3]**

## E. Procedural Background

In 2012, name.space filed a complaint in the Central District of California, alleging that ICANN violated sections 1 and 2 of the Sherman Act, the Lanham Act, the California Cartwright Act, and the California Business and Professions Code in connection with the 2012 Application Round. The complaint also alleged common law trademark, unfair competition, and tortious interference claims.

In 2013, the district court granted ICANN's motion to dismiss the complaint, holding that the trademark and unfair competition claims failed to present a justiciable case or controversy, and that the other claims failed to state a claim upon which relief could be granted.**[4]** The district court dismissed the Sherman Act § 2 claim with prejudice, and granted name.space leave to amend as to all other claims. After name.space elected not to amend, final judgment was entered in favor of ICANN. This timely appeal followed.

---

[3] name.space's complaint only challenges the 2012 Round's rules and procedures. We therefore do not consider today any questions concerning the subsequent delegation of TLDs.

[4] ICANN had also moved to dismiss on the ground that the release clause in the 2000 application barred liability on all claims. The district court converted the motion into one for summary judgment, which it denied. ICANN does not seek review of that decision.

## II.  Jurisdiction and Standard of Review

We have jurisdiction over this appeal under 28 U.S.C. § 1291.  We review de novo dismissals for failure to state a claim, *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010) ("*ICANN Transparency*"), and for absence of a justiciable case or controversy, *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1084 (9th Cir. 2003).  "All allegations of material fact are taken as true and are construed in the light most favorable to" the plaintiff.  *ICANN Transparency*, 611 F.3d at 501.

## III.  Sherman Act § 1

Section 1 of the Sherman Act prohibits conspiracies "in restraint of trade or commerce."  15 U.S.C. § 1.  A § 1 claim requires: (1) a "contract, combination or conspiracy among two or more persons or distinct business entities"; (2) which is intended to restrain or harm trade; (3) "which actually injures competition"; and (4) harm to the plaintiff from the anticompetitive conduct.  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (internal quotation marks omitted).  "Because § 1 . . . does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (alterations, citations, and internal quotation marks omitted).

A complaint asserting a § 1 claim must allege facts "plausibly suggesting (not merely consistent with)" a conspiracy.  *Id.* at 557.  It is not enough merely to include conclusory allegations that certain actions were the result of a conspiracy; the plaintiff must allege facts that make the

conclusion plausible. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047–48 (9th Cir. 2008). This standard does not impose a "probability requirement," but "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *See Twombly*, 550 U.S. at 556.

The complaint in this case alleges that the rules and procedures governing the 2012 Application Round were the result of a conspiracy between ICANN, its board members, and industry insiders. As is common, the complaint includes no direct allegation of an agreement among the alleged co-conspirators. *See Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1450–51 (9th Cir. 1988). Rather, the complaint's conspiracy assertion rests on the following alleged circumstantial evidence: (a) some of ICANN's board members have "known, vested interests in the economic performance of the TLD registries"; (b) ICANN and its board designed the rules for the 2012 Application Round; (c) the 2012 application price was significantly higher than the 2000 price, and the rules more complex; (d) the 2012 Application Round's price and rules conflicted with name.space's business model; (e) the majority of 2012 applicants were industry insiders and large technology companies; and (f) some potential applicants, including name.space, were deterred from applying in 2012 by the price and rules.

We cannot, however, infer an anticompetitive agreement when factual allegations "just as easily suggest rational, legal business behavior." *Kendall*, 518 F.3d at 1049. Here, ICANN's decision-making was fully consistent with its agreement with the DOC to operate the DNS and the Root. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 n.21 (1986)

("[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy."); *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (explaining that courts must consider obvious alternative explanations for a defendant's behavior when analyzing plausibility). In transferring control to ICANN, the DOC specifically required it to coordinate the introduction of new TLDs onto the Root. This is exactly what ICANN did in the 2012 Application Round—after determining that the Internet could sustain more TLDs, ICANN created a process for TLD registries to apply for new ones. The 2012 rules and procedures were facially neutral, and there are no allegations that the selection process was rigged. *See ICANN Transparency*, 611 F.3d at 502–03 (affirming in part a dismissal of a § 1 claim because there were insufficient allegations that competitive bidding was rigged).

name.space contends that an anticompetitive agreement nonetheless is plausible because the rules of the 2012 Application Round, including the application fee and limit of one TLD per application, were contrary to its business model. But, absent allegations that suggest ICANN's decisions were illogical or suspicious, *see Twombly*, 550 U.S. at 556 n.4; *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012) (noting that it "strain[ed] credulity" that alleged conduct occurred absent unlawful coordination), ICANN's independent business decisions about how many TLDs to create, and at what price they are offered, are not policed by § 1, *see T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 634 (9th Cir. 1987). ICANN was not required to replicate the 2000 Application Round in 2012, or even to create new TLDs. The application rules served to ensure that those

who obtained new TLDs would be financially stable. This is a perfectly logical decision, and one that ICANN, through its contract with the DOC, had full authority to make.

The complaint alleges that ICANN's board members had motive to design an application process that would benefit their corporate allies. But such motive alone cannot sustain a § 1 claim. *See Matsushita*, 475 U.S. at 597 n.21; *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (citing VI Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1411, at 68 (2d ed. 2003)), *aff'd*, 741 F.3d 1022 (9th Cir. 2014). And, the complaint includes no specific allegations of wrongdoing that would indicate that the board members acted with an improper motive. *Cf. Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 560–62, 571–72 (1982) (evidence that committee members used their positions to disparage a rival's product); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 659–60 (1961) (per curiam) (association members conspired to withhold a necessary certification from rival).

name.space alleges that the rules advantaged the businesses with which some board members were associated. But, it was understood from ICANN's inception that its board would include industry insiders, and that the board would approve the application process. *See* Management of Internet Names and Addresses, 63 Fed. Reg. at 31,749–50. We cannot infer an illegal agreement with outside interests simply because ICANN's rational business decisions favor the status quo rather than name.space's untested alternative business model. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764

(1984) ("There must be evidence that tends to exclude the possibility that the [alleged conspirators] were acting independently.").

It may well be, as name.space claims, that an "open Internet" represents better public policy than one with a more limited supply of TLDs.  But the DOC left that choice to ICANN.  At bottom, name.space's complaint alleges that ICANN's actions should be viewed as arising from a conspiratorial agreement because a conspiracy is theoretically possible.  But that is not enough to state a § 1 claim.  We cannot infer a conspiracy based on speculation that the very type of board members the DOC sought must have conspired to restrain trade simply because the system they adopted made it difficult for name.space to carry out its business plans.[5]

## IV.  Sherman Act § 2

Section 2 of the Sherman Act prohibits monopolization. 15 U.S.C. § 2.  "There are three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) (quoting *Cal. Computer Prods.,*

---

[5] Because the analysis under the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700–16770, is identical to that under the Sherman Act, *see Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001), we also affirm the district court's dismissal of the Cartwright Act claim.

*Inc. v. Int'l Bus. Mach. Corp.*, 613 F.2d 727, 735 (9th Cir. 1979)) (internal quotation marks omitted).[6]

The complaint posits three relevant markets: (a) the market to act as a TLD registry; (b) the international market for domain names; and (c) the market for blocking or defensive registration services.  ICANN, however, is neither a registry nor a registrar.  Because ICANN is not a competitor in any of the three markets, they cannot serve as the basis for a § 2 monopoly claim.  *See Mercy-Peninsula Ambulance, Inc. v. San Mateo Cnty.*, 791 F.2d 755, 759 (9th Cir. 1986) ("The gravamen of a section 2 claim is the deliberate use of market power by a competitor to control price or exclude competition."); *see also Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2004) ("There is no question that [defendant] does not participate in the Spanish-language radio market.  Thus, [defendant] cannot attempt to monopolize that market.").

name.space argues that ICANN should be considered a participant in the three markets because ICANN has ultimate control over TLDs, which are the essential aspect of each of the relevant markets.  But this does not mean that ICANN competes in the markets.  In *Mercy-Peninsula*, we addressed whether a county monopolized a market because it chose which company would provide paramedic services.  791 F.2d at 756.  We rejected § 2 liability, holding that because "the county is not a competitor in the health care provision market," it "cannot be charged with

---

[6] No claim for conspiracy to monopolize was raised in the complaint.

having used market position to exclude competition." *Id.* at 759; *see also Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 392–93 (S.D.N.Y. 2007) (rejecting the argument that "market power under Section 2 of the Sherman Act encompasses 'influence' by a non-competitor over the relevant market").[7]

Even if ICANN competed in any of the relevant markets, § 2 liability could only arise if ICANN unlawfully acquired or maintained its monopoly. *See Allied Orthopedic*, 592 F.3d at 998. The district court correctly held that ICANN's authority was lawfully obtained through a contract with the DOC. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) (distinguishing "willful acquisition" of monopoly power from "development as a consequence of a superior product, business acumen, or historic accident"). A monopolist can also violate § 2 by engaging in predatory behavior against potential competitors. *See ICANN Transparency*, 611 F.3d

---

[7] Contrary to name.space's argument, this case is not akin to *Tate v. Pacific Gas & Electric Co.*, 230 F. Supp. 2d 1072 (N.D. Cal. 2002). There, the relevant market was "natural-gas technologies and/or the specialized equipment needed to supply the specialized fuels," which encompassed two distinct competing technologies—compressed natural gas ("CNG") and liquefied natural gas ("LNG"). *Id.* at 1075–76. Although the defendant only sold CNG, the district court held it could be liable for hindering a LNG competitor based on allegations that it was protecting its CNG business and later planned to enter, and monopolize, the LNG market. *Id.* at 1078–79. Here, in contrast, ICANN does not need to hinder any of the relevant markets to protect its own monopoly, and there are no allegations that it plans to enter any of them.

at 506; *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547–49 (9th Cir. 1991). But name.space does not allege such behavior; indeed, name.space is not restricted from establishing TLDs on alternative root files.

The DOC chose ICANN to manage the DNS and the Root. Barring predatory behavior, ICANN is "free to choose the parties with whom [it] will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004). The complaint merely alleges that the 2012 Application Round was structured in a manner not advantageous to name.space's business model. But whether ICANN's choices were wise or fair is an issue outside the purview of § 2.

## V. Trademark Claims

Trademark and unfair competition law protect against the misleading use of another's mark. *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 (9th Cir. 2003); *Los Defensores, Inc. v. Gomez*, 166 Cal. Rptr. 3d 899, 912–13 (Ct. App. 2014). The complaint asserts Lanham Act, common law trademark, and common law unfair competition claims because ICANN accepted applications for TLDs in use by name.space.[8] The district court found these claims not ripe for adjudication. We agree.

---

[8] Like the parties, we treat the three related claims collectively.

"A question is fit for decision when it can be decided without considering 'contingent future events that may or may not occur as anticipated, or indeed may not occur at all.'" *Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010) (quoting *Cardenas v. Anzai*, 311 F.3d 929, 934 (9th Cir. 2002)). We applied this principle to a patent infringement claim in *Swedlow, Inc. v. Rohm & Haas Co.*, 455 F.2d 884 (9th Cir. 1972) (per curiam). The plaintiff in that case alleged that the operation of a factory under construction would, upon completion, infringe on the plaintiff's patents. *Id.* at 885. We affirmed the dismissal of this claim as unripe, finding the threat of infringement "too remote and unduly speculative" because only the floor and the shell of the factory were then in place. *Id.* at 886.

The *Swedlow* analysis applies here. *See Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*, No. CV 12–08968 DDP (JCx), 2013 WL 489899, at *5 (C.D. Cal. Feb. 7, 2013) (applying *Swedlow* to trademark infringement). name.space has not alleged that ICANN has delegated or intends to delegate any of the TLDs that name.space uses. All that name.space alleges is that ICANN has accepted applications from companies wanting to use one of those TLDs on the Root. Although name.space may have a ripe claim if such a delegation occurs, the complaint as it stands does not allege "actual or imminent infringement." *Swedlow*, 455 F.2d at 886.[9]

---

[9] Because the complaint contains no allegations about delegations, we do not today consider whether an actual delegation would give rise to a

We are unpersuaded by name.space's argument that the acceptance of the applications and fees alone constitutes infringement. The cases it cites all deal with situations in which the defendant clearly intended to violate plaintiff's trademarks in the near future. *See Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1311–12, 1314 (9th Cir. 1997) (finding Lanham Act liability for a defendant who "admitted to offering to sell counterfeit Levi's jeans and components"); *Millennium Labs., Inc. v. Ameritox, Ltd.*, No. 12CV1063-MMA (JMA), 2012 WL 4863781, at *1 (S.D. Cal. Oct. 12, 2012) (denying a motion to dismiss an infringement claim against a defendant who offered to sell a product employing similar trade dress); *Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F. Supp. 2d 965, 970–72 (N.D. Cal. 2006) (granting a preliminary injunction against a defendant who used plaintiff's trademark in its product packaging, but had yet to actually sell it). No such facts were alleged here. Nor did ICANN "use" the TLDs simply by accepting the applications. *See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) ("Infringement claims are subject to a commercial use requirement."); *Los Defensores*, 166 Cal. Rptr. 3d at 913 (noting that unfair competition liability requires a "misleading or deceptive use").

## VI.  Tortious Interference Claims

name.space alleges California common law claims for tortious interference with contract and prospective economic advantage. The elements of a tortious

---

justiciable controversy or the merits of such a controversy. *See supra* note 3.

interference with contract claim are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 825 (9th Cir. 2008). A tortious interference with prospective economic advantage claim has the same elements (focusing instead on the existence and knowledge of a prospective economic relationship), but also requires that the defendant's conduct be "wrongful by some legal measure other than the fact of interference itself." *Kor. Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003) (internal quotation marks omitted).

The district court properly dismissed these claims. name.space does not allege any facts plausibly suggesting that ICANN accepted applications in the 2012 Round with the intent to breach or disrupt any existing contracts or prospective economic relationships. name.space, moreover, does not allege any specific resultant disruption to contractual or economic relationships. *See, e.g.*, *Image Online*, 2013 WL 489899, at \*9–10; *Conte v. Jakks Pac., Inc.*, No. 1:12–CV–00006–LJO–GSA, 2012 WL 6115632, at \*5–6 (E.D. Cal. Dec. 10, 2012); *Semi-Materials Co. v. SunPods, Inc.*, No. 11–CV–06719–LHK, 2012 WL 3962487, at \*6 (N.D. Cal. Sept. 10, 2012). And, the failure to sufficiently allege a wrongful act outside of the interference itself forecloses an interference with prospective economic advantage claim. *See Kor. Supply*, 63 P.3d at 950.

## VII.  Unfair Business Practices Claim

"California's statutory unfair competition laws broadly prohibit unlawful, unfair, and fraudulent business acts."

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (citing *Kor. Supply*, 63 P.3d at 943). Statutory liability can be premised on antitrust or trademark violations.  *See id.* at 1152 (antitrust); *Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994) (trademark). Because name.space failed to state an antitrust violation, trademark claim, or other unlawful act, the district court properly dismissed this claim.

## VIII.  Conclusion

For the reasons stated above, we **AFFIRM** the judgment of the district court.