Filed 1/24/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LOS DEFENSORES, INC.,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>ROSA GOMEZ et al.,<br><br>       Defendants and Appellants. | B240725<br>(Los Angeles County<br>Super. Ct. No. BC411527) |

APPEAL from a judgment of the Superior Court of Los Angeles, Mary Ann Murphy, Judge.  Affirmed.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup and Caroline E. Chan; Law Offices of Robert C. Moest and Robert C. Moest for Defendants and Appellants.

Towle Denison Smith & Maniscalco, James P. Maniscalco and Amanda R. Washton for Plaintiff and Respondent.

In the underlying action, the trial court ordered the entry of a default against appellants as a sanction for discovery abuse, and issued a default judgment awarding respondent damages and injunctive relief. Appellants contend that the discovery sanctions were improper, that the complaint stated no cause of action, that they received inadequate notice of the damages respondent sought, and that the damages awarded were excessive. We reject these contentions, and affirm.

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A. *Underlying Action*

Respondent Los Defensores, Inc. is an "attorney joint advertising group" that focuses on the Spanish speaking market in Southern California. Beginning in 1984, respondent's advertising included the telephone numbers "213-636-3636" and "714-636-3636." Later, in 1988, respondent obtained the rights to the toll-free telephone number "1-800-636-3636," which was incorporated into respondent's advertising.

In April 2009, respondent initiated the underlying action against appellants Armando Vera and Rosa Gomez. The first amended complaint, filed April 29, 2009, contained claims for unfair business competition and "[p]assing [o]ff." According to the complaint, Vera and Gomez owned the rights to phone numbers that closely resembled respondent's toll-free number. The complaint further alleged that when callers mistakenly dialed Vera and Gomez's numbers in an effort to contact respondent, Vera and Gomez intentionally referred them to attorneys not affiliated with respondent. In May 2010, the complaint was amended to name as "Doe" defendants appellants Donald C. Amamgbo and Amamgbo & Associates, P.L.C. (Amamgbo & Associates).

2

B.  *Respondent's Initial Discovery Motions*

In July 2010, respondent filed two motions to compel discovery. Respondent requested an order directing the depositions of Vera and Gomez, who refused to appear at their depositions on the ground that they had received a bankruptcy discharge.  Respondent contended that the bankruptcy discharge did not encompass its claims against Vera and Gomez, and that the automatic stay accompanying the bankruptcy proceedings ended with the discharge.[1]  In addition, respondent sought an order compelling Vera and Gomez to respond to requests for the production of documents.  Respondent asserted that Vera and Gomez provided no documents in response to the request.  Both motions sought an award of sanctions.

On October 19, 2010, the trial court granted the motions.  Pursuant to a stipulation of the parties, the court ordered Vera and Gomez to produce responsive documents by October 26, 2010, and to appear for depositions in November 2010. The court awarded no sanctions.

C.  *Second Amended Complaint*

On January 19, 2011, respondent filed its second amended complaint (SAC), which is the operative complaint in the action.  The SAC asserts claims for unfair competition and "passing off" under the common law, and a claim for violations of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.).

---

[1]     Respondent also contended Gomez and Vera provided respondent with no notice of the bankruptcy proceedings prior to the discharge.

3

The SAC alleges the following facts: Since 1984, respondent's advertising in Southern California has focused on the "easy-to-remember" string of numerals "636-3636," as found in its toll-free number. Nearly all of respondent's advertising uses that toll-free number. As a result of respondent's substantial investment in advertising, which totaled more than $123 million since 1984, respondent's "calling card" number 636-3636 gained "significant notoriety." To determine the efficacy of the advertising, respondent asked members of "focus groups" whether they "knew of the telephone number of any []group of lawyers." According to the SAC, "the overwhelming response [was] '636-3636.'"

The SAC further alleges that Vera and Gomez, together with attorney Amamgbo and his law firm, entered into a "conspiracy scheme" in an effort to "ride [respondent's] coattails." They obtained the rights to several telephone numbers incorporating the "636-3636" string, including those in the 949, 626, 818, 310, and 661 area codes. Due to the similarity between those numbers and respondent's toll-free number, appellants receive calls from persons seeking respondent's legal services. Rather than informing callers of their mistake, appellants "go [to] great lengths to avoid answering any questions about whether they are [respondent] or whether they have any affiliation with [respondent]. . . . [T]o deflect questioning . . . , [appellants] say they are 'an office for lawyers' or something equivalent to that effect in an attempt to implicitly pass themselves off as affiliated with [respondent]."

According to the SAC, appellants' intent was "to injure [respondent's] business and usurp [respondent's] good will," and their wrongful conduct caused damages to respondent, as well as "actual mistakes, confusion, or deception of the general public." The SAC requested an award of damages, including punitive damages, and "an accounting of [appellants'] unjust profits." In addition, the SAC

4

sought preliminary and permanent injunctions barring appellants from using any telephone number incorporating the numerical string "636-3636."

D.  *Respondent's Subsequent Discovery Motions*

In March 2011, respondent filed motions to compel discovery against Vera, Gomez, and Amamgbo & Associates.  Respondent contended that Vera and Gomez had not responded to discovery propounded in November 2010, including interrogatories and requests for the inspection and production of documents.  The motions noted, inter alia, that during Vera's and Gomez's depositions, they referred to a "status book" and a call log in which information regarding calls to their "636-3636" numbers was recorded.  Vera and Gomez testified that they recorded caller information in a status book.  In addition, Vera acknowledged that the cell phone associated with the "636-3636"'s lines had a "call log" of incoming phone numbers, and appellants' defense counsel, Robert C. Moest, promised to transcribe the numbers in it.  According to respondent, Vera and Gomez failed to produce the status book and call log, despite respondent's requests at the depositions and in the inspection demands.  Respondent sought orders compelling the discovery and awarding sanctions.

In addition, in a motion directed against Amamgbo & Associates, respondent contended that from June to December 2010, it propounded three rounds of discovery, including requests for admissions, form interrogatories, special interrogatories, and request for production of documents.  According to respondent, Amamgbo & Associates failed to respond to many of the requests for admission and interrogatories, responded deficiently to the remaining requests for admission and interrogatories, and produced few of the requested documents.  Respondent sought orders compelling Amamgbo & Associates to respond

5

adequately to the discovery, deeming certain requests for admission to be admitted, and awarding sanctions.

In a two-page consolidated opposition, appellants' defense counsel, Moest, stated: "[Appellants] concede that there is substantial overdue discovery, and that a number of errors were made in the form of the responses provided. [Appellants] are well along in the process of remedying the alleged deficiencies . . . ." The opposition challenged only the amount of sanctions requested by respondent, which totaled $15,000.

On May 19, 2011, the trial court granted the motions against Gomez and Vera. The court granted the motion against Amamgbo & Associates insofar as it sought an order compelling discovery, but denied it insofar as it sought an order deeming certain requests for admission to be admitted.[2] The court also awarded sanctions totaling $6,380 against Vera, Gomez, Amamgbo & Associates, and their counsel.

E. *Motions for a Preliminary Injunction and Discovery Sanctions*

In November 2011, respondent filed motions for a preliminary injunction and for discovery sanctions. Respondent sought an injunction barring appellants from using telephone numbers incorporating the numerical string "636-3636." Respondent also requested the imposition of monetary, issue, or terminating

---

[2] We recognize that the minute order reflecting the May 19, 2011 rulings states that the motion against Amamgbo & Associates was granted in full, and that the motion against Gomez was denied to the extent it sought an order deeming certain requests for admission to be admitted. However, the minute order appears to contain a typographical error, as only the motion against Amamgbo & Associates sought relief for defective responses to requests for admission.

sanctions, arguing that appellants had engaged in significant misconduct during discovery, including the spoliation of evidence.

### 1. *Showings Regarding Motion for Preliminary Injunction*

In seeking a preliminary injunction, respondents submitted excerpts from appellants' depositions and other evidence supporting the following version of the underlying facts: Vera was born in Peru, where he attended college, but obtained no degree. In 2000, after emigrating to the United States, Vera operated a car rental business, and obtained the rights to the "636-3636" telephone numbers in the 949, 626, 818, 310, and 661 areas codes for use in connection with that business. He soon discovered that callers asked him for legal services, and had the "big idea" that the numbers were more valuable to law firms than to a rental car company. Vera started "working for the attorneys," and "gave [them] those lines so that [he] could work."

In 2007, Vera and Gomez, who were then married, were employed by attorney Les Sherman, who paid them $10,000 per month to use the telephone numbers. In mid-2007, Sherman sold his practice to attorney Amamgbo for approximately $300,000 after Sherman was charged with federal income tax evasion. Amamgbo continued to use the "636-3636" telephone numbers, and paid salaries to Vera and Gomez totaling approximately $12,800 per month.

According to Amamgbo, the "636-3636" numbers rang on a particular cell phone that Vera possessed "99 percent of the time." Vera and Gomez testified that their duties for Amamgbo consisted of answering calls on the "636-3636" lines, recording the callers' information in a "status book," and setting up appointments for callers. The callers were primarily Spanish speakers, and the majority sought legal services. According to Vera, when a caller sought an attorney, he wrote

7

down the caller's information on a "piece of paper, or whatever is handy," filled out "the paperwork that the attorney require[d]," and recorded the information in the status book.

Vera and Gomez testified that they answered the calls by saying, "'Law office. How can I help you?'" or simply, "'Law offices.'" Nonetheless, respondent had received complaints from callers who used appellants' "636-3636" telephone numbers. According to those complaints, the callers were told they had contacted respondent.

After the inception of the underlying litigation, Vera and Gomez transferred their telephone company accounts for the "636-3636" numbers to Amamgbo. In September 2011, a California state bar court determined that Amamgbo had settled cases without his clients' consent and forged their signatures. The state bar court recommended that the Supreme Court impose disciplinary measures, namely, a stayed one-year suspension and two years of probation. In addition, malpractice and fraud actions were then pending against Amamgbo.

Appellants' opposition to the request for a preliminary injunction offered no evidence. They argued, inter alia, that respondent had failed to assert claims warranting injunctive relief.

### 2. *Showings Regarding Motion for Discovery Sanctions*

In seeking discovery sanctions, respondent maintained that appellants had violated the trial court's May 2011 discovery orders. Aside from monetary sanctions, respondent sought issue sanctions, including a determination of its damages, or alternatively, terminating sanctions in the form of the entry of appellants' default. Regarding the request for issue sanctions, respondent asked for a ruling that its annual damages amounted to at least $1,051,596, and offered a

8

calculation that its advertising had effectively conferred annual benefits on appellants totaling as much as $2,631,443.72.

Respondent submitted evidence that despite the May 2011 orders, appellants concealed or destroyed records regarding their "636-3636" telephone lines. Respondent noted that in November 2010, Vera and Gomez testified during their depositions that they entered caller information in a status book, and that missed phone calls were transferred to a voicemail system maintained by a central operator. After the depositions, respondent propounded discovery requests encompassing the status book and call log (or call logs) for the telephone lines, the voicemail system related to the lines, and the identity of the central operator of the voicemail system. Because appellants' initial response to the requests consisted solely of objections, respondent sought the discovery orders issued on May 19, 2011.

According to respondent's showing, following those orders, appellants produced no written documents or call logs regarding incoming calls on the "636-3636" lines. They provided only a privilege log concerning a single item they characterized as a "statute book," the entire contents of which were purportedly subject to the attorney-client and work product privileges. Appellants also produced no recordings of incoming or outgoing voicemail messages, and denied the existence of a central operator.[3] Respondent argued that appellants' failure to produce any call logs or voicemail messages signified the potential destruction of evidence, as appellants had continued to use the phone lines after Vera disclosed the existence of the call logs and messages in his November 2010 deposition.

---

[3] In response to respondent's request for outgoing voicemail messages, appellants provided only the untranslated text of a Spanish message that they stated had been used "for approximately one year."

9

Respondent also submitted evidence that despite the May 2011 orders, appellants produced no financial records related to their "636-3636" telephone lines. Respondent noted that in 2010, it propounded a demand for inspection of documents on Amamgbo & Associates, seeking financial records from "any business" using one of appellants' "636-3636" numbers. In addition, respondent asked Amamgbo & Associates to produce at its deposition financial records related to all the numbers. No financial records were provided in response to those requests, even though Amamgbo appeared at the deposition in November 2010 and testified that he had "things [you] acquire[] in the normal course of business that you use for your tax returns and preparation, expenses, things of that nature." Following the May 19, 2011 orders, Amamgbo & Associates again produced no financial records. Instead, it filed a supplemental response to respondent's demand for inspection, claiming that no documents existed.[4]

In addition, respondent submitted evidence that despite the May 2011 orders, appellants declined to identify other attorneys who may have benefited from their "636-3636" telephone numbers. Respondent noted that in November 2010, it asked Amamgbo & Associates to disclose the identities of attorneys with whom it had fee sharing agreements after Amamgbo & Associates began receiving calls on the "636-3636" lines. Amamgbo & Associates' initial response consisted solely of objections. Following the May 2011 orders, Amamgbo & Associates acknowledged that it occasionally collaborated with other attorneys on a shared fee basis, but declined to provide the terms of the agreements or identify those

---

[4]     According to respondent, appellants also failed to respond to requests for information regarding the use of their telephone numbers for the benefit of other attorneys.

10

attorneys, asserting that none of the pertinent clients had been "obtained through a '636' call."

In opposing discovery sanctions, appellants contended they had fully responded to all discovery and had produced every relevant and non-privileged item. They denied any spoliation or destruction of evidence, arguing that respondent "misinterpreted deposition transcripts to evidence documents that never existed." In addition, they noted that they had paid the discovery sanctions awarded in May 2011.

Supporting the opposition were declarations from Vera and defense counsel Moest. Vera stated that he had produced all the documents and records in his possession, with the exception of the item listed in the privilege log. Moest maintained that appellants had fully complied with respondent's discovery requests and the May 2011 orders, stating: "It is my understanding that none of the [appellants] herein kept records of calls received at any of the subject telephone numbers . . . . The written material [respondent] still complains of not receiving never existed, as far as I know, and my clients would have had to somehow make something up for [respondent], which I told them not to do."

### 3. *Trial Court's Rulings*

On November 29, 2011, following a hearing, the trial court determined that respondent was entitled to a preliminary injunction, concluding that respondent had shown that it was likely to prevail on the merits of its case at trial, and that the balance of potential harms to the parties favored respondent. In addition, the court imposed terminating sanctions on appellants in the form of the entry of their default, concluding that they had contravened its May 2011 orders. The court

11

stated that appellants' conduct was "an extremely severe and aggravated failure to comply with [its] order[s], with substantial sanctions doing nothing."

F. *Default Judgment*

In January 2012, respondent filed its "prove up" packet in support of a default judgment, which relied primarily on the evidence it had submitted in seeking a preliminary injunction. Respondent requested damages totaling $11,638,920, pointing to the discussion of damages presented in its motion for discovery sanctions. Later, in a supplemental brief requested by the trial court, respondent offered an alternative calculation of its total damages, which determined them to be at least $689,520.

On April 9, 2012, following a hearing, the trial court entered a default judgment in favor of respondent and against appellants. The judgment awarded respondent $691,280 in damages, and included a permanent injunction barring appellants from using their "636-3636" telephone numbers. This appeal followed.[5]

**DISCUSSION**

Appellants contend (1) that the terminating sanctions were improper, (2) that the SAC stated no cause of action, (3) that they received inadequate notice of

---

[5]    Respondent has filed a motion to augment the record with several documents, only two of which -- Exhibits 1 and 2 -- concern proceedings before the filing of the notice of appeal. As our review is properly limited to the rulings identified in that notice (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813), we grant the motion solely with respect to Exhibits 1 and 2, and deny it with respect to the remaining documents.

12

respondents' claimed damages, and (4) that respondent was awarded excessive damages. As explained below, we reject their contentions.

### A. *Terminating Sanctions*

Appellants contend that the trial court erred in imposing terminating sanctions. They challenge the court's finding that they willfully failed to comply with the May 2011 orders, arguing "[appellants] did not willfully disobey. It is not a matter of [appellants] not wanting to or not trying to comply. They were simply unable to produce documents that do not exist, were unable to preserve things that did not exist, and refused to manufacture evidence for the purpose of responding to discovery. They should not have been penalized as such."

#### 1. *Governing Principles*

"California discovery law authorizes a range of penalties for conduct amounting to 'misuse of the discovery process,'" including terminating sanctions. (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 991, quoting Code Civ. Proc., § 2023.030.) Misuses of the discovery process include the following: "(d) Failing to respond or to submit to an authorized method of discovery. [¶] (e) Making, without substantial justification, an unmeritorious objection to discovery. [¶] (f) Making an evasive response to discovery. [¶] (g) Disobeying a court order to provide discovery." (Code Civ. Proc., § 2023.010.) Terminating sanctions may take the form of "[a]n order rendering a judgment by default against [the offending] party." (Code. Civ. Proc., § 2023.030, subd. (d)(4).)

"'The power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action." (*Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 36.)

13

The trial court may order a terminating sanction for discovery abuse "after considering the totality of the circumstances:  [the] conduct of the party to determine if the actions were willful; the detriment to the propounding party; and the number of formal and informal attempts to obtain the discovery."  (*Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1246.)  Generally, "[a] decision to order terminating sanctions should not be made lightly.  But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction."  (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279-280.)  Under this standard, trial courts have properly imposed terminating sanctions when parties have willfully disobeyed one or more discovery orders.  (*Lang v. Hochman*, *supra*, 77 Cal.App.4th at pp. 1244-1246 [discussing cases].)

When the trial court's exercise of its discretion relies on factual determinations, we examine the record for substantial evidence to support them.  (*Waicis v. Superior Court* (1990) 226 Cal.App.3d 283, 287; see *Miranda v. 21st Century Ins. Co.* (2004) 117 Cal.App.4th 913, 929.)  In this regard, "the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination [of the trier of fact]."  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874, italics deleted.)  These principles encompass our review of the court's finding that appellants willfully violated its May 2011 orders.  (*Liberty Mutual Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1102-1104.)

14

## 2. *Analysis*

We conclude there is sufficient evidence that appellants willfully failed to comply with the May 2011 orders. To begin, the record discloses ample evidence that despite the May 2011 orders, appellants willfully concealed or destroyed written documents and other records regarding phone calls on their "636-3636" telephone lines. In November 2010, Vera testified in his deposition that he wrote down caller information and prepared other paperwork "the attorney require[d]" before entering that information in the status book. In addition, during the deposition, Vera admitted that the cell phone connected to the "636-3636" lines had a call log that recorded incoming phone numbers. When respondent's counsel asked to examine the call log, Moest declined to give him access to it, but agreed to transcribe the phone numbers on it.

After Vera's deposition, respondent propounded discovery seeking written and electronic records of incoming calls. However, following the May 2011 orders, appellants provided none of the above-described documents and records identified during Vera's deposition. In opposing respondent's motion for discovery sanctions, appellants relied on declarations from Vera and Moest, who asserted that the documents "never existed."

Notwithstanding Vera's and Moest's declarations, the evidence before the trial court was sufficient to support its finding of willful noncompliance. On review for substantial evidence, we will affirm a finding predicated on the trial court's rejection of a witness's testimony, "unless it appears that there are no matters or circumstances [that ] . . . impair the accuracy of the testimony . . . ." (*La Jolla Casa de Manana v. Hopkins* (1950) 98 Cal.App.2d 339, 345.) When the underlying evidence consists of declarations, the rule applicable to our review "is the same as that governing oral testimony . . . ." (*Hammel v. Lindner* (1964) 224

15

Cal.App.2d 426, 431-432.) Because Vera's and Moest's declarations contradicted Vera's own deposition testimony, we find no error in the court's determination that appellants' showing was not credible.[6]

For similar reasons, we conclude there is sufficient evidence that appellants willfully failed to comply with the May 19, 2011 orders in other respects. Even though Vera testified that missed phone calls were transferred to a voicemail system maintained by a central operator, appellants produced no recordings of incoming or outgoing voicemail messages, and neither identified nor provided documents related to the system's central operator. Appellants also produced no financial records related to their "636-3636" telephone lines, although Amamgbo testified that he had records "acquire[d] in the normal course of business," and appellants otherwise admitted in discovery that Amamgbo & Associates was responsible for paying for the lines. In addition, appellants never identified any of the attorneys with whom they admittedly had fee sharing agreements or the terms of such agreements, after Amamgbo & Associates began receiving calls on the "636-3636" lines. In sum, because there is sufficient evidence that appellants willfully violated the May 2011 orders in several ways, the trial court did not abuse its discretion in imposing terminating sanctions.

---

[6] On a related matter, we note that the trial court, in imposing terminating sanctions, also concluded that appellant's privilege log regarding the "statute book" was "not in proper form," and amounted to an "evasion of the [c]ourt's orders." Because appellants do not challenge this determination on appeal, they have forfeited any contention of error regarding it.

16

B.  *Adequacy of the Complaint*

Appellants contend the default judgment is invalid because the SAC states no claim.  They argue that the allegations in the SAC assert no claims supporting the damages and injunctive relief awarded in the judgment.

### 1.  *Governing Principles*

Generally, a defendant in default "confesses the material allegations of the complaint.  [Citation.]"  (*Taliaferro v. Davis* (1963) 216 Cal.App.2d 398, 408-409.)  Nonetheless, the trial court may not enter a default judgment when the complaint's allegations do not state a cause of action.  (*Id.* at pp. 408-414; *Taliaferro v. Taliaferro* (1959) 171 Cal.App.2d 1, 3-9.)  No judgment can rest on such a complaint, as a defendant in default "'admits only facts that are well pleaded.'"  (*Falahati v. Kondo* (2005) 127 Cal.App.4th 823, 829, quoting 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 160, p. 574; *Buck v. Morrossis* (1952) 114 Cal.App.2d 461, 466.)

Our inquiry here into the complaint's adequacy is akin to that triggered by a general demurrer, namely, whether the complaint lacks factual allegations indispensable to the asserted claims.  (*Zucco v. Farullo* (1918) 37 Cal.App. 562, 564; *Alexander v. McDow* (1895) 108 Cal. 25, 29.)  A court must indulge reasonable inferences in support of the factual allegations in the complaint; mere uncertainties and other defects subject to a special demurrer do not bar a default judgment against the defendant.  (*Buck v. Morrosis*, *supra*, 114 Cal.App.2d at p. 466; see *Price v. Hibbs* (1964) 225 Cal.App.2d 209, 218.)  Nonetheless, the absence of essential factual allegations is fatal to a judgment against the defendant.  (See *Falahati v. Kondo*, *supra*, 127 Cal.App.4th at p. 830 [complaint contained no

17

factual allegations regarding defaulting defendant, who was mentioned only in caption].)

### 2. *Unfair Competition and "Passing Off"*

The SAC purports to assert claims under the common law for unfair competition and "passing off," as well as a statutory claim for unfair competition under the UCL. Under these claims, the SAC seeks damages, including recovery of appellants' "unjust profits," and injunctive relief. Because damages are unavailable as a remedy under the UCL (*Clark v. Superior Court* (2010) 50 Cal.4th 605, 610), we focus our inquiry on the common law claims.[7]

Although the term "unfair competition" applies to several types of misconduct (*Balboa Ins. Co. v. Trans Global Equities* (1990) 218 Cal.App.3d 1327, 1341-1343), the tort of unfair competition pertinent here is "the act of 'passing off' one's goods as those of another." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1263.) That tort "developed as a equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection." (*Ibid.*) Injunctive relief and damages are available for common law unfair competition involving fraud or an intent to mislead consumers. (*Modesto Creamery v. Stanislaus Creamery Co.* (1914) 168 Cal. 289, 291-292 (*Modesto Creamery*); see also *Gordon v. Warner Bros. Pictures, Inc.* (1969) 269 Cal.App.2d 31, 39 [injunctive relief and damages available for unfair competition when defendant's conduct is fraudulent]; *Wood v.*

---

[7]     The UCL defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) Under the UCL, damages cannot be recovered, and plaintiffs are generally limited to injunctive relief and restitution. (*Clark v. Superior Court*, *supra*, 50 Cal.4th at p. 610.)

*Peffer* (1942) 55 Cal.App.2d 116, 125 [in cases of unfair competition, injunctive relief and accounting of wrongful profits available upon a showing of fraud or intent to divert the plaintiff's business by unlawful means].)

"The purpose of the equitable doctrine is to prevent unfair competition through misleading or deceptive use of a term exclusively identified with the claimant's product and business [citation], affording judicial protection whenever 'the name and the business [through continued association] become synonymous in the public mind; and submerges the primary meaning of the name . . . in favor of its meaning as a word identifying that business.' [Citation.] The crucial element is the mental association in the buyer's mind between the mark used in connection with the product and a single source of origin." (*North Carolina Dairy Foundation, Inc. v. Foremost-Mckesson, Inc.* (1979) 92 Cal.App.3d 98, 108 (*North Carolina Dairy Foundation*), quoting *Visser v. Macres* (1963) 214 Cal.App.2d 249, 253.)

Under the doctrine, even a term or mark with a common meaning may trigger the crucial mental association when it acquires a "secondary meaning," that is, becomes identified in "the relevant marketplace" with a product from "a unique or particular source." (*North Carolina Dairy Foundation, supra,* 92 Cal.App.3d at pp. 107-108.) The development of that secondary meaning does not require "that the buyer must actually know the name of the source[,] but only that the buyer directly associate the mark with but one, though, anonymous, source." (*Id.* at p. 108.) Thus, "'secondary meaning is a shorthand phrase which describes the existence of conditions from which public confusion will flow if the defendant is permitted to pursue his deceptive scheme [citation]. If words have been *used* or *employed* . . . in such a manner that the public has learned to associate them with the thing described, they acquire a secondary meaning [citation]. . . . If an

19

association is thereby formed in the minds of the public which fixes plaintiffs as the source of something of a particular nature to be available in a particular place, this is sufficient . . . .'" (*Id*. at pp. 108-109, quoting *Metro-Goldwyn-Mayer, Inc. v. Lee* (1963) 212 Cal.App.2d 23, 30.)

The common law tort of unfair competition has long been recognized in California. An instructive decision is *Modesto Creamery*. There, the plaintiff, a creamery located in Modesto, sold butter in wrappers bearing the word "Modesto." (*Modesto Creamery*, *supra,* 168 Cal. at p. 291.) After ten years, the defendant began selling butter in similar wrappers in the same area. (*Ibid*.) When the plaintiff sued the defendant, the trial court awarded the plaintiff damages and injunctive relief. (*Ibid*.) The court found that the word "Modesto," as used by the plaintiff, had acquired "'a special significance and secondary meaning apart from its geographical sense,'" and had come to signify the plaintiff's butter; in addition, the court found that the defendant acted with the intent to mislead customers. (*Id*. at pp. 291-292.) Our Supreme Court affirmed the judgment, concluding that the plaintiff was entitled to an injunction, an accounting to determine the defendants' profits from its misconduct, and an award of those profits. (*Id*. at pp. 292-295.)

3. *Analysis*

Although our research has disclosed no California decision holding that an action for common law unfair competition is properly predicated on the use of business telephone numbers, we find guidance from *Cytanovich Reading Center v. The Reading Game* (1984) 162 Cal.App.3d 107 (*Cytanovich*). There, the plaintiff and defendant provided reading improvement services in the same community. (*Id*. at p. 109.) The plaintiff adopted as its business telephone number "321-

7323," and incorporated the number in its advertising in the alphanumerical form "321-READ." (*Ibid*.) Soon afterward, the defendant began using the telephone number "494-7323," and displayed it in advertising in the alphanumerical form "494-READ." (*Ibid*.) When the plaintiff filed an action against the defendant for unfair competition and trademark infringement, the trial court initially ordered a preliminary injunction, but ultimately issued a judgment in favor of the defendant and against the plaintiff. (*Id*. at p. 110.)

On appeal, the plaintiff contended the defendant had engaged in unfair competition. (*Cytanovich*, *supra*, 162 Cal.App.3d at p. 110.) The appellate court concluded that "the use of such telephone numbers *may* provide the basis for a claim of unfair competition, at least under circumstances similar to those suggested in the present case. Basic and essential to such a determination by a trial court . . . are its factual findings and conclusions as to material considerations such as these: Whether there is some imitation of the telephone number associated with a particular service; whether the telephone number represents a somewhat novel or distinctive use; whether the telephone number imitated has received some significant prior use; whether a largely coterminous or at least competitive service area is involved; whether there is a likelihood that the ordinary public will be deceived; and, if the alphanumeric representation is generic or descriptive, whether it has acquired a secondary meaning such that a substantial segment of the purchasing public associates the symbol with the original, single source of a given service." (*Id*. at p. 114.) The appellate court nonetheless declined to reverse the judgment, as the record on appeal was insufficient to show that the trial court's implied findings regarding these matters were erroneous. (*Id*. at pp. 114-115.)

In view of *Cytanovich*, we conclude that unfair competition claims may be founded on the use of business telephone numbers, provided that facts sufficient to

21

establish unfair competition are present. (See also *Dial-A-Mattress Franchise Corp. v. Page* (2d Cir. 1989) 880 F.2d 675, 677 [under federal and state unfair competition laws, merchant whose advertising had long displayed local phone numbers containing alphanumerical string "'MATTRES'" was entitled to injunction against rival using "800" number containing that string].) As noted above, unfair competition ordinarily involves the existence of a secondary meaning -- that is, a "mental association in the buyer's mind between the mark used in connection with the product and a single source of origin"-- and a "'deceptive scheme'" that exploits that secondary meaning. (*North Carolina Dairy Foundation, supra,* 92 Cal.App.3d at pp. 107-108.) Furthermore, damages and injunctive relief are proper when there is fraud or an intent to mislead. (*Modesto Creamery, supra*, 168 Cal. at pp. 291-292; *Gordon v. Warner Bros. Pictures, Inc.*, *supra*, 269 Cal.App.2d at p. 39; *Wood v. Peffer*, *supra*, 55 Cal.App.2d at p. 125.)

Here, the SAC asserts those key facts. The SAC alleges that since 1984, respondent's advertising incorporated the easy-to-remember numerical string "636-3636," as found in its toll-free number; that the numerical string thus acquired "significant notoriety," and was associated with respondent by consumers in respondent's target market; that appellants intentionally used telephone numbers incorporating the "636-3636" string to pass themselves off as affiliated with respondent; and that they engaged in misleading conduct to avoid informing callers that they were not so affiliated. Although the similarity between respondent's toll-free number and appellants' numbers resides simply in a numerical string, rather than in an alphanumerical mnemonic term (such as "READ"), the SAC asserts that the "easy-to-remember" numerical string has

22

acquired the requisite secondary meaning, and that appellants intentionally engaged in a deceptive scheme to exploit that meaning.

We recognize that although the SAC alleges that appellants were aware that callers sought respondent's services, it contains no allegation that appellants affirmatively represented themselves as respondent. Nonetheless, concealment or partial suppression of material facts constitutes fraud when there is a duty to disclose those facts. (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336.) The duty to disclose generally requires a relationship grounded in "some sort of transaction between the parties. [Citations.] Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.]" (*Id.* at pp. 336-337, italics omitted.) As the SAC asserts the existence of such a relationship between callers and appellants, it adequately alleges that appellants engaged in fraudulent conduct. We therefore conclude that the SAC states an unfair competition claim for damages and injunctive relief.

Appellants contend the unfair competition claim is premised on the "flawed theory" that respondent has rights of ownership or control over appellants' own telephone numbers. We disagree. Respondent's claim is predicated not on its ownership or control of phone numbers containing the pertinent numerical string, but on its right to prevent deceptive conduct aimed at consumers by exploiting the numerical string after it has acquired a secondary meaning. (*Modesto Creamery*, *supra*, 168 Cal. at p. 293.) As our Supreme Court has explained, an unfair competition claim "'does not depend on the ownership by the plaintiffs of any particular word, phrase, or device, as a trademark. . . . The right of action in such a case arises from the fraudulent purpose and conduct of the defendant and the injury caused to the plaintiffs thereby, and it exists independently of the law

23

regulating trademarks or of the ownership of such trademark by the plaintiffs. The gist of such an action is not the appropriation and use of another's trademark, but the fraudulent injury to and appropriation of another's trade.'" (*Ibid*., quoting *Banzhaf v. Chase* (1907) 150 Cal. 180, 183)

Appellants' reliance on *Holiday Inns, Inc. v. 800 Reservation Inc*. (6th Cir. 1996) 86 F.3d 619 (*Holiday Inns*) and *Dranoff-Perlstein Assocs. v. Sklar* (3d Cir. 1992) 967 F.2d 852 (*Dranoff-Perlstein Assocs*.) is misplaced. In *Holiday Inns*, a hotel chain asserted unfair competition and trademark infringement claims under the Lanham Act (15 U.S.C. §§ 1114, 1125) against a reservation service, alleging that the service used a phone number that customers often misdialed when attempting to contact the hotel chain via its "800" number. (86 F.3d at pp. 620-621.) After the hotel chain secured summary judgment on its claims, the Sixth Circuit reversed, concluding there was no evidence that the reservation service created or promoted consumer confusion. (*Id*. at pp. 622-626.) The Sixth Circuit noted there was evidence that the reservation service tried to dispel confusion by a recorded message informing callers that they had not reached the hotel chain. (*Ibid*.) In contrast, the SAC alleges that appellants intentionally avoided dispelling consumer confusion, and exploited it to their own advantage.

In *Dranoff-Perlstein Assocs*., the plaintiff and defendant practiced personal injury law in the same area. (*Dranoff-Perlstein Assocs., supra,* 967 F.2d 852 at p. 853.) After the plaintiff advertised a business telephone number containing the alphanumerical string "INJURY-1," the defendant advertised a similar number containing the alphanumerical string "INJURY-9." (*Id*. at pp. 853-854.) When the plaintiff asserted unfair competition and trademark infringement claims under the Lanham Act against the defendant, the trial court granted summary judgment in the defendant's favor. (*Dranoff-Perlstein Assocs., supra,* at p. 854.) The Third

24

Circuit reversed the summary judgment, reasoning that there were triable issues of fact whether the alphanumerical string "INJURY-1" had a secondary meaning sufficient for Lanham Act claims. (*Id.* at pp. 860-863.) In so concluding, the Third Circuit determined that the alphanumerical string "INJURY," viewed in isolation, supported no such claims because it was generic, that is, it spelled out a generally known term descriptive of the parties' legal services. (*Id.* at pp. 861-862.)

That is not true, however, of the numerical string "636-3636," which has no common descriptive meaning related to legal services. Rather, respondent's unfair competition claim relies on the allegation that the "easy-to-remember" numerical string had acquired a secondary meaning designating respondent's services due to its advertising. In sum, we conclude that the SAC asserts claims sufficient to support the judgment.

### C. *Notice of Amount of Damages*

Pointing to Code of Civil Procedure section 580, appellants contend the trial court erred in issuing a default judgment awarding damages, because the SAC does not allege the amount of respondent's damages. For the reasons explained below, their contention fails, as respondent served a predefault notice specifying the amount of its damages.

### 1. *Governing Principles*

Subdivision (a) of Code of Civil Procedure section 580 provides that "[t]he relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint . . . ." Generally, "the primary purpose of the section is to guarantee defaulting parties adequate notice of the maximum judgment that may

25

be assessed against them." (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 826 (*Greenup*).) Because the statutory notice requirement is intended to ensure "'fundamental fairness,'" it is subject to "strict construction." (*Ibid*., quoting *Becker v. S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 494 (*Becker*).) The requirement is thus applicable in cases in which the defendant's default is ordered as a discovery sanction. (*Greenup*, *supra*, 42 Cal.3d at p. 829.)

The notice requirement is nonetheless subject to at least two exceptions. The first arises in cases involving statutory prohibitions of a statement of the amount of damages in the complaint. Under Code of Civil Procedure section 425.10, subdivision (b), a complaint in an action for personal injury or wrongful death may not state the amount of damages. Similarly, under Civil Code section 3295, subdivision (e), a complaint may not state the amount of punitive damages sought. In such cases, Code of Civil Procedure section 425.11, subdivision (b), and section 425.115, subdivision (b), permit the service of notices on the defendant stating the amounts of the plaintiff's compensatory and punitive damages. Under Code of Civil Procedure section 580, subdivision (a), those notices establish the maximum amount of a default judgment against the defendant, if properly served before the entry of default. (*Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1520-1521 (*Van Sickle*).)

The notice requirement is also subject to an exception in actions in which an accounting is sought. The leading case regarding this exception is *Ely v. Gray* (1990) 224 Cal.App.3d 1257 (*Ely*). There, the plaintiff sued the defendant, seeking the dissolution of two partnerships in which they had participated, along with an accounting. (*Id*. at p. 1260.) The complaint did not specify the amount due the plaintiff. (*Ibid*.) When the defendant failed to answer the complaint, the

26

court ordered the entry of his default and rendered a default judgment in favor of the plaintiff for $44,618.44. (*Ibid*.)

On appeal, the defendant contended the judgment was void because the complaint contained no allegation specifying the amount due the plaintiff. (*Ely*, *supra*, 224 Cal.App.3d at p. 1259.) The appellate court observed that the notice requirement in Code of Civil Procedure section 580, subdivision (a), places plaintiffs seeking an accounting "in a bind," as the presence of allegations in a complaint specifying an amount due ordinarily undermines a prayer for an accounting. (*Ely*, *supra*, at pp. 1261-1262.) To resolve that conundrum, the court looked to the statutory scheme governing the first exception to the notice requirement. The court concluded: "By analogy [with those statutes], . . . a plaintiff who seeks an accounting has the solution of [a] postcomplaint and predefault notice to the defendant of the amount the plaintiff will seek to prove due him if the defendant defaults. As with Code of Civil Procedure section 425.11, the notice must be given with adequate time for the defendant to respond before a default is entered." (*Ely*, *supra*, at p. 1263.) Turning to the case before it, the appellate court reversed the judgment, as the plaintiff had provided no such notice to the defendant. (*Id*. at pp. 1263-1264.)

Following *Ely*, a division of opinion has arisen regarding whether a plaintiff seeking an accounting must provide a predefault notice of the amount due. In *Cassel v. Sullivan, Roche & Johnson* (1999) 76 Cal.App.4th 1157, 1159-1160 (*Cassel*), an attorney filed an action against a legal partnership in which he had participated, seeking an accounting and a valuation of his interest in the partnership. His complaint specifically alleged that the partnership possessed the financial records needed to determine that interest. (*Id*. at p. 1159.) After the partnership failed to answer the complaint, its default was entered and a judgment

for $305,690 was issued in the attorney's favor.  (*Id*. at p. 1160.)  Before the trial court, the partnership challenged the judgment, arguing that the attorney never served the notice required under *Ely*.  (*Ibid*.)  The trial court set aside the judgment, permitted the attorney to serve a notice of the amount due, and rendered a second default judgment for $305,690 in the attorney's favor.  (*Ibid*.)

On appeal, the partnership contended that both judgments were void because no notice of the amount due had been served prior to the entry of default.  (*Cassel*, *supra*, 76 Cal.App.4th at p. 1157.)  In rejecting that contention, the appellate court concluded that the holding in *Ely* requiring such a notice was not "analytically sound."  (*Id*. at p. 1164.)  The court stated:  "We hold that in an action seeking to account for and value a former partner's partnership interest and for payment of that interest, the complaint need only specify the type of relief requested, and not the specific dollar amount sought.  We foresee no danger that defaulting defendants will be taken by surprise by judgments entered against them, because . . . they will be in possession of the essential information necessary to calculate their potential exposure."  (*Id*. at pp. 1163-1164.)  The court thus ordered the second judgment vacated and the first judgment reinstated.  (*Id*. at p. 1164.)

In *Van Sickle*, *supra*, 196 Cal.App.4th at p. 1527, the appellate court rejected *Cassel* in favor of *Ely*.  There, the former client of an attorney sued him for breach of fiduciary duty, alleging that he had mismanaged property she had obtained in a divorce.  (*Id*. at pp. 1500-1503.)  Her complaint sought an accounting and contained no demand for a specific amount of money.  (*Ibid*.)  She also provided no statement of an amount due her before the trial court ordered the entry of a default judgment against the attorney for discovery misconduct.  (*Ibid*.)  In reversing the default judgment, the appellate court distinguished *Cassel*, noting that the complaint in that action -- unlike the client's complaint -- alleged that the

28

defendant possessed the records necessary to assess the value of the potential judgment. (*Id*. at pp. 1526-1527.) The appellate court further stated that even if *Cassel* were not factually distinguishable, it would apply *Ely*, which it viewed as correctly decided. (*Id*. at p. 1527.)

### 2. *Analysis*

It is unnecessary for us to resolve this division of opinion, as the default judgment against appellant was proper under both *Ely* and *Cassel*. As explained below, the SAC adequately pleaded a request for an accounting, and respondent served a predefault notice of an amount due.[8]

"An action for an accounting is equitable in nature. It may be brought to compel the defendant to account to the plaintiff for money or property, (1) where a fiduciary relationship exists between the parties, or (2) where, even though no fiduciary relationship exists, the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable. [Citations]." (5 Witkin, Cal. Procedure (2008) Pleading, § 819, p. 236; see *Civic Western Corp. v. Zila Industries, Inc.* (1977) 66 Cal.App.3d 1, 14.) To plead a request for an accounting, a complaint "need only state facts showing the existence of the

---

[8]     We note that the decisions upon which appellants rely are factually distinguishable, as none involved an action for an accounting. (*Greenup*, *supra*, 42 Cal.3d at pp. 826-831 [modifying damages awarded in default judgment entered as discovery sanction in personal injury action because plaintiff served no notice of damages]; *Becker*, *supra*, 27 Cal.3d at pp. 492-495 [modifying default judgment to reflect amount of damages specified in complaint]; *Gudarov v. Hadjieff* (1952) 38 Cal.2d 412, 416 [modifying default judgment awarding punitive damages not requested in complaint]; *Burtnett v. King* (1949) 33 Cal.2d 805, 806-811 [reversing default judgment that awarded property rights not specified as potential relief in complaint].)

relationship which requires an accounting and the statement that some balance is due the plaintiff." (*Brea v. McGlashan* (1934) 3 Cal.App.2d 454, 460.)

The SAC satisfies those requirements. As explained above (see pt. B.3.), the SAC states a common law claim for unfair competition in the form of "passing off." Furthermore, the SAC requests an award of damages and "an accounting of [appellants'] unjust profits." Generally, under the common law, an accounting of the defendant's wrongful profits is available for unfair competition when the defendant intended to cause consumer confusion. (Rest.3d Unfair Competition, § 37.) In *Modesto Creamery*, our Supreme Court held that the plaintiff was entitled to an accounting for lost profits under factual circumstances similar to those alleged in the SAC. (*Modesto Creamery, supra*, 168 Cal. at pp. 292-295.) We therefore conclude that the SAC adequately pleads a request for an accounting.

The record further discloses that prior to the entry of appellants' default, respondent gave them notice of the amount of damages it sought. Respondent's motion for discovery sanctions stated that appellants had been using their "636-3636" telephone numbers since 2007. Moreover, in seeking issues sanctions, the motion stated: "[Respondent] propounded discovery requests for [Amamgbo & Associates's] financial records and information in order to determine *the amount of damages in this case*, i.e., *the amount of money* [appellants] *wrongfully profited* from their use of the infringing phone numbers. . . . Due to [Amamgbo & Associates's] refusal to provide any of the documents requested that would substantiate these figures, [respondent] seeks an order . . . *deeming the damages in this case to amount to at least $1,051,596.00 per year*." (Italics added.) In an effort to support that estimate of damages, respondent offered a calculation of the benefits appellants had derived from respondent's advertising expenditures.

According to the calculation, the value of those benefits was approximately $2,631,443.72 per year.

In our view, respondent's request satisfied the requirement stated in *Ely* for a predefault notice akin to that specified in Code of Civil Procedure section 425.11, subdivision (b). Under that statute, a statement of damages must "set[] forth the nature and amount of the damages being sought." Respondent's request supplied that information, as it sought an order determining that appellant's "wrongful[]" profits amounted to at least $1,051,596.00 per year since 2007.**9** Furthermore, because respondent served the motion for sanctions 27 days before the trial court ordered the entry of a default judgment, appellants received reasonable notice of the damages sought. (*See Schwab v. Southern California Gas Co.* (2004) 114 Cal.App.4th 1308, 1323 [defendant had reasonable notice when served with statement of damages 15 days prior to entry of default].) We therefore reject appellant's contention that the judgment is defective because the SAC does not specify the amount of respondent's damages.

D. *Amount of Damages*

Appellants contend the damages awarded in the default judgment are excessive. They argue that the $691,280 award of damages "ha[s] absolutely nothing to do with [their] profits," and is not supported by the evidence presented in respondent's "prove up" packet. We reject their contentions.

---

**9**      Appellants suggest that respondent's explanation of its estimate of the amount of wrongful profits was defective or insufficient. However, as subdivision (b) of Code of Civil Procedure section 425.11 requires no explanation for the estimate of the amount of damages sought, that portion of respondent's request was superfluous, for purposes of notice of the damages demanded.

Generally, in cases of unfair competition, "the profit made by the wrongdoer is a proper element of damage." (*Ojala v. Bohlin* (1960) 178 Cal.App.2d 292, 302; *Modesto Creamery*, *supra*, 168 Cal. at pp. 294-295.) Under the rule of damages for unfair competition, the plaintiff "'is entitled to all the profit which was in fact realized.'" (*Ojala v. Bohlin*, *supra*, 178 Cal.App.2d at p. 302, quoting *Graham v. Plate* (1871) 40 Cal. 593, 598.) Ordinarily, the plaintiff may recover only the defendant's net profits attributable to the wrongful conduct. (Rest.3d Unfair Competition, §37, com. g, p. 400.) Nonetheless, "[t]he defendant bears the burden of proving any costs or expenses to be deducted from gross income in calculating net profit." (*Ibid.*)

Here, respondent's "prove up" packet initially sought damages totaling $11,638,920. Noting that appellants' failure to provide any financial records "undermined [respondent's] ability to calculate [their] unjust profits," respondent argued that it was entitled to "restitutionary or compensatory damages" based on the calculations in its motion for discovery sanctions. According to those calculations, appellants had received the benefits of advertising valued at $2,631,443,72 per year since 2007, resulting in damages totaling $11,638,920.

Later, in a supplemental brief requested by the trial court, respondent offered an alternative calculation of its damages, which determined them to be at least $689,520. The alternative calculation relied on the payments Vera and Gomez had received from Amamgbo and his law firm. Respondent offered evidence that appellants engaged in their wrongful conduct for at least 4.42 years, during which Vera and Gomez received funds totaling $156,000, based on their testimony that Vera received $10,000 per month and Gomez received $700 per week. Respondent maintained that it was entitled to recover at least $689,520,

which represented the total funds paid to Vera and Gomez during the 4.42 year period.

In support of this estimate, respondent argued: "If [Amamgbo & Associates] was willing to pay . . . Gomez and Vera $156,000 annually essentially for use of the ["636-3636"] numbers, it clearly was making significantly more than that amount from its use of the numbers. Thus, [appellants] themselves through their actions have demonstrated that the use of the ["636-3636"] numbers [is] easily worth over $156,000 per year."

At the hearing on respondent's request for a default judgment, the trial court rejected respondent's demand for $11,638,920 in damages, and instead determined that respondent was entitled to $691,280 in damages. In so doing, the court apparently concluded that the payments to Vera and Gomez provided an adequate basis for a determination of appellants' net profits, as the court noted those payments in announcing its rulings. We further observe that the court's award of damages closely tracks Vera's and Gomez's testimony regarding the payments. Because Gomez was paid $700 per week, she received $36,400 per year (based on a 52-week year). As Vera was paid $120,000 per year ($10,000 per month for 12 months), they jointly received $156,400 per year. Accordingly, during the 4.42 year period, they were paid funds totaling $691,288, which is effectively the amount of damages awarded in the judgment.

We see no error in the trial court's determinations, as funds that a defendant receives for carrying out unfair competition constitute a portion of the net profits from that tortious conduct. For purposes of determining the net profits from unfair competition, "[t]he value of the defendant's own labor . . . , and salaries or wages paid to persons responsible for the tortious conduct, are not ordinarily deductible" from gross income or profits. (Rest.3d Unfair Competition, § 37, com. g, p. 400.)

33

This is because the contrary rule would effectively require plaintiffs to pay defendants for their intentional wrongful conduct. (4 Callman, Unfair Competition, Trademarks and Monopolies (4th ed. 2010) § 23:62, pp. 23-657–23-658.)

In view of the allegations in the SAC and respondent's "prove up" showing, the trial court reasonably concluded that Vera and Gomez were paid "salaries" solely for their efforts in effectuating the tortious scheme, that is, providing the "636-3636" lines, receiving calls on the lines, and directing callers to Amamgbo and his law firm. The trial court's award of damages thus represents a conservative estimate of appellants' collective net profits. In sum, the damages awarded in the judgment were not excessive.[10]

---

[10] Appellants suggest that the award of damages cannot be based on the payments to Vera and Gomez for the full 4.42 year period because Vera and Gomez received a bankruptcy discharge in July 2010, approximately 16 months before the trial court issued the preliminary injunction. As appellants offer no argument (with citation to appropriate legal authorities) that the bankruptcy discharge limited their liability for damages, they have forfeited any such contention. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 844, fn. 3.)

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

**CERTIFIED FOR PUBLICATION**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.